# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 46
The People &c.,
   Respondent,
  v.
Robert Hinshaw,
   Appellant.

Lucas G. Mihuta, for appellant.
Ashley R. Lowry, for respondent.

WILSON, J.:

Because the state trooper lacked an objectively reasonable suspicion that a crime had occurred or probable cause to stop Mr. Hinshaw's vehicle for a traffic infraction, we conclude the automobile stop was unlawful.

On the afternoon of November 8, 2014, a New York State Trooper stopped a vehicle on a street in Buffalo. The trooper had observed no traffic violations and saw that the inspection sticker was valid, both of the occupants were wearing their seatbelts, and "everything looked good." Nevertheless, the trooper ran a check of the car based on the front license plate. The inquiry produced a response that began with a direction to "CONFIRM RECORD WITH ORIGINATOR," listed as the Buffalo City Police Department. The response then instructed:

> **THE FOLLOWING HAS BEEN REPORTED AS AN IMPOUNDED VEHICLE ---- IT SHOULD NOT BE TREATED AS A STOLEN VEHICLE HIT ---- NO FURTHER ACTION SHOULD BE TAKEN BASED SOLELY UPON THIS IMPOUNDED RESPONSE**

The trooper directed the driver to stop in order to "investigate further and find out what the problem [wa]s." The driver, Mr. Hinshaw, provided his license and registration to the trooper; both were in order. When the trooper asked about the impound notification, Mr. Hinshaw explained that the car had been stolen previously.[1] The trooper detected an odor of marijuana and observed a "roach" in the center console. He proceeded to search both the driver and the passenger of the vehicle and found additional marijuana on the floor of the passenger side of the car and in Mr. Hinshaw's waistband. The trooper eventually found a loaded gun under the driver's seat.

---

[1] Records from the Parking Violations Bureau show that, after a payment of fees on October 28, the impounded vehicle had been lawfully released to Mr. Hinshaw more than a week before the trooper stopped him.

By indictment, Mr. Hinshaw was charged with second-degree criminal possession of a weapon (Penal Law § 265.03 [3]) and unlawful possession of less than an ounce of marijuana (Penal Law § 221.05). He moved to suppress the marijuana, the gun, and his statements. At the suppression hearing, the trooper testified that he did not attempt to confirm the information with the originator; he treated the notice as indicating the car may have been stolen; and he had stopped the car based solely on the results of the license plate check. County Court denied suppression of the physical evidence but granted suppression of Mr. Hinshaw's inculpatory statements that preceded a Miranda warning. Thereafter, Mr. Hinshaw pled guilty to the entire indictment. The Appellate Division affirmed, concluding that the "impoundment report, coupled with the [t]rooper's explanation of its import, provided reasonable suspicion to stop the vehicle" (People v Hinshaw, 170 AD3d 1680, 1681 [4th Dept 2019]). Two Justices dissented, contending that it was not objectively reasonable to believe that any crime had been committed on the basis of the license plate inquiry result (id. at 1682-83 [Whalen, P.J., and Centra, J., dissenting]).

I.

Under the settled law of New York, an automobile stop "is a seizure implicating constitutional limitations" (People v Spencer, 84 NY2d 749, 752 [1995]). Automobile stops are lawful only when "based on probable cause that a driver has committed a traffic violation" (People v Robinson, 97 NY2d 341, 349-350 [2001]); when based on a reasonable suspicion that the driver or occupants of the vehicle have committed, are committing, or are about to commit a crime (Spencer, 84 NY2d at 752-753); or, "when

conducted pursuant to 'nonarbitrary, nondiscriminatory, uniform' highway traffic procedures" (People v Sobotker, 43 NY2d 559, 563 [1978]).

In People v Robinson, we held that a traffic stop did not violate the New York State Constitution where a police officer had probable cause to believe that an automobile driver had committed a traffic violation – even though the officer's primary motivation to stop the vehicle may have been other than the traffic violation (Robinson, 97 NY2d at 349). We noted that although the language of the Fourth Amendment and of article I, Section 12 of our Constitution was "identical," that language conferred only "similar" rights, explaining that this Court had not hesitated to expand the rights of New York citizens beyond those required by the Federal Constitution (id. at 350). In that case, the defendant had asked us to "extend[] [the] protections of our Constitution beyond those given by the Federal Constitution" to require *more* than probable cause when an officer had stopped a vehicle for pretextual reasons (id. at 351). We declined to do so, rejecting the defendant's request to invalidate vehicle stops for pretextual reasons as long as "probable cause existed warranting a stop of the vehicle for a valid traffic infraction" (id. at 349). We emphasized that "[t]his Court has always evaluated the validity of a traffic stop based on probable cause that a driver has committed a traffic violation" and "confirm[ed] a standard that constrains police conduct – probable cause under the Vehicle and Traffic Law and its related regulations" (id. at 350, 358; see also People v Bushey, 29 NY3d 158, 164 [2017] [New York law forbids stops of vehicles, even those that appear "unusual . . . , solely to examine

the motorist's license and registration," but permits such stops if the officer "obtained probable cause to believe the vehicle was being operated with a suspended registration"]).

In contrast to the Fourth Amendment, which "permits brief investigative stops . . . when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity'" (Navarette v California, 572 US 393, 396 [2014]; see also Terry v Ohio, 392 US 1 [1968]), this Court has adopted greater protections than Terry and its federal progeny for pedestrian stops by the police (see People v De Bour, 40 NY2d 210, 223 [1976] [creating a four-tiered framework for evaluating police-civilian encounters]).  Our De Bour test, in which "constitutional law and common law both played a part" (People v Hollman, 79 NY2d 181, 195 [1992]), is more protective of the rights of individuals "to be free from aggressive governmental interference" (De Bour, 40 NY2d at 216; cf. People v Gates, 31 NY3d 1028, 1030 [Garcia, J., dissenting] ["The De Bour method differs significantly from the federal approach . . . The hyper-stringent rule of De Bour also serves as a barrier to legitimate, effective and minimally-intrusive law enforcement practices"]).  Thus, "[t]he continued vitality of De Bour . . . is not contingent upon the interpretation that the Supreme Court gives the Fourth Amendment, because De Bour is largely based upon considerations of reasonableness and sound State policy" (Hollman, 79 NY2d at 195).  As relevant here, to curb potential discriminatory practices, New York also provides greater protections than does federal law for traffic infraction vehicle stops, as evidenced by our decision in Robinson (see Robinson, 97 NY2d at 353). There, we emphasized that "[d]iscriminatory law enforcement has no place in our law"

(id.). Correspondingly, suspicionless traffic stops – such as sobriety checkpoints – are allowed in New York only when conducted in a "uniform and nondiscriminatory manner" (Matter of Muhammad F., 94 NY2d 136, 145-146 [1994]).

Although De Bour – like Terry – was a case involving the forcible stop of a pedestrian, we noted there that "whether or not a particular search or seizure is to be considered reasonable requires a weighing of the government's interest against the encroachment involved with respect to an individual's right to privacy and personal security" (De Bour, 40 NY2d at 215). A forcible stop of the occupants in a vehicle is equally intrusive whether done to enforce the laws against traffic infractions or the laws against crimes. The required "balancing of the interests involved" will differ, however, when the suspected illegality is a traffic violation or a crime, as reflected in the legislature's taxonomy. Requiring probable cause for the former, but the more relaxed standard of reasonable suspicion for the latter, comports with the legislature's directive that traffic infractions are not crimes and consequently their enforcement by means of a forcible stop, though quite important, does not carry the same governmental interest as the prevention of crimes (see Vehicle and Traffic Law § 155).[2] Moreover, we have repeatedly stated that an officer's "right to request information while discharging [] law enforcement duties will hinge on the manner and intensity of the interference, *the gravity of the crime involved* and

_____

[2] The dissent's characterization of the distinction between traffic infractions and crimes as "accidents of legislative organization" (dissenting op at 19) belittles the legislature's express instruction that "[a] traffic infraction is not a crime" (Vehicle and Traffic Law § 155).

the circumstances attending the encounter" (id. at 219 [emphasis added]).  Although "[w]e

recognize that the obvious impact of stopping the progress of an automobile is more

intrusive than the minimal intrusion involved in stopping a pedestrian" (People v John BB,

56 NY2d 482, 487 [1982]), the same basic balancing is mandated by our Constitution, as

explained in De Bour (id. at 217-218; see also Hollman, 79 NY2d at 189; People v Garcia,

20 NY3d 317, 324 [2012] ["the standards of De Bour and Hollman govern police-citizen

encounters during lawful traffic stops"]).  Thus, when a traffic violation, not a crime, is the

predicate of an officer's forcible stop of a motorist, greater scrutiny is required to prevent

"a policemen's badge . . . [from] be[ing] considered a license to oppress" (De Bour, 40

NY2d at 220).  The same interests that led us to adopt De Bour rather than the federal

standard, and to reaffirm New York's further protections in Hollman, "are no less vital

today" (Hollman, 79 AD3d at 195) – indeed, some of them are today far greater.

Unsurprisingly, then, our traffic stop jurisprudence has not proceeded in lockstep with

federal constitutional standards (People v Class, 67 NY2d 431 [1986]), and the standard

articulated here is based squarely on the law of New York.[3]

---

[3] Previous statements of this Court that we require "at least a reasonable suspicion" that
the occupants of a car have engaged in conduct in violation of law (see e.g. dissenting op
at 17) are completely consistent with that standard: we require *at least* reasonable
suspicion for an automobile stop; in the case of an automobile stop based merely on a
traffic infraction, we require probable cause (see Robinson, 97 NY2d at 358 ["we
confirm a standard that constrains police conduct – probable cause under the Vehicle and
Traffic Law and its related regulations"]; People v Harrison, 57 NY2d 470, 476 [1982]
["a stop is nevertheless a limited seizure of a person which at least requires reasonable
suspicion"]).  The dissent's reliance on People v Harrison, wherein the police ordered the
occupants of a parked vehicle to stay in the vehicle, for the proposition that New York
courts applied the "'reasonable suspicion' standard to traffic stops across the board"
(dissenting op at 7-8) is misplaced: Harrison, a case that "does not deal with the powers

We do little more today than clarify the law of New York as it is presently understood by all four Appellate Division departments.[4] Our statement in Robinson that "[t]his Court has always evaluated the validity of a traffic stop based on probable cause that a driver has committed a traffic violation" has been understood and repeated by all four Appellate Division departments to mean that an officer must have probable cause to stop a vehicle for a traffic infraction (see e.g. People v White, 40 AD3d 535, 536 [1st Dept 2005] ["(a) vehicular stop requires probable cause to believe the driver has committed a traffic violation"] [emphasis added]; People v Sluszka, 15 AD3d 421, 423 [2d Dept 2005] [applying probable cause to a Vehicle and Traffic Law violation rather than reasonable suspicion as the court below had]; People v Driscoll, 145 AD3d 1349, 1349 [3d Dept 2016] ["(i)n order for a traffic stop to pass constitutional muster, before making the stop, 'a police

_____

of the police to stop a vehicle," held that the police went beyond a De Bour level two request for information and instead conducted a level three forcible stop "by the order to remain in the car" and accordingly "there must be some articulable facts, which initially or during the encounter establish reasonable suspicion that the person is involved in criminal acts" (id. at 476). When a forcible stop of a vehicle is conducted for a traffic infraction as opposed to criminality, more is required.

[4] Thus, the dissent's hypothesized "absurd applications" are an exercise in fanciful fiction (dissenting op at 22-23) – nothing has changed. For example, an officer who observes a car failing to maintain its lane or being driven erratically (see e.g. Schoonmaker v New York State Dept of Motor Vehicles, 33 NY3d 926, 927 [2019]); hears excessive or unusual muffler noises (see e.g. People v Wright, 98 NY2d 657, 658 [2002]); sees a car speeding through a red light (see e.g. Robinson, 97 NY2d at 346); sees a car turn without signaling (id. at 347); or observes a car with tinted windows (see e.g. People v Gomez, 5 NY3d 416 [2005]) has probable cause to stop a vehicle. Nothing in our decision curtails an officer's ability to stop a vehicle when the officer has observed or learned information that establishes probable cause that a traffic violation has occurred or has reasonable suspicion to believe a crime has occurred.

officer (must have) probable cause to believe that the driver of an automobile has committed a traffic violation'"] [internal parentheses in original]; People v Washburn, 309 AD2d 1270, 1271 [4th Dept 2003] [stating the three-part standard as written here]; see also People v Marshall, 46 Misc 3d 1027A [Ithaca City Ct 2015] [after "engag(ing) in a thorough review of the case law of the Four Appellate Divisions" on this question, finding that since 2012 "the Appellate Courts are now unanimous in employing the elevated Robinson standard of 'probable cause' required for an officer to validly stop a vehicle for a Vehicle and Traffic violation"]).[5]  Thus, the dissent's position – that police officers lacking probable cause may seize the occupants in vehicles for traffic violations – has not prevailed in the courts of New York, even if it remains the standard in federal courts.

Not only is the standard we articulate today now applied by all departments of the Appellate Division, but it is advocated by both parties here.  Even the People in this case argue – correctly – that "[a]utomobile stops are reasonable, and therefore lawful, where the police have probable cause to believe that a traffic violation has occurred, or 'when there exists at least a reasonable suspicion that the driver or occupants of the vehicle have committed, are committing, or are about to commit a crime'" (Brief for Respondent at 9, quoting Bushey [29 NY3d at 164] and Robinson [97 NY2d 341]).  The Appellate Division,

---

[5] The dissent relies primarily on the pronouncements of trial-level courts and on Appellate Division cases since abandoned by those departments.  Each department, as discussed *supra*, has now adopted the rule that probable cause is necessary, not just sufficient, for an automobile stop on the basis of a traffic infraction (see e.g. Driscoll, 145 AD3d at 1349; Matter of Deveines v New York State Dept. of Motor Vehicles Appeals Bd., 136 AD3d 1383, 1384-1385 [4th Dept 2016]).

in its decision below, stated that bifurcated test exactly the same way: "It is well settled that to conduct a traffic stop, police require either probable cause to believe that a traffic infraction has been committed, or 'reasonable suspicion that the driver or occupants of the vehicle have committed, are committing or are about to commit a crime'" (Hinshaw, 170 AD3d at 1680-1681).[6]

In addition to its misplaced reliance on federal precedent, the dissent's disagreement with the standard for automobile stops in New York rests on *dicta* in People v Ingle (36 NY2d 413 [1975]) that we have since rejected (dissenting op at 6). The question in Ingle was whether the police could stop a vehicle to check its registration when there was *neither* probable cause *nor* reasonable suspicion to do so (Ingle, 36 NY2d at 420).[7] We held that

---

[6] Here, we are required to consider both prongs of that bifurcated standard. The Appellate Division found that the trooper stopped "the car to investigate whether the vehicle had registration problems, the license plates or insurance were suspended, or if the vehicle was, in fact, stolen" (Hinshaw, 170 AD3d at 1680). The People advance each of those as a ground upon which the stop was lawful. Contrary to the suggestion of our dissenting and concurring colleagues, it is incumbent on us to determine whether any ground argued by the People provided a lawful basis for the vehicle stop. The first three reasons provided by the trooper for stopping Mr. Hinshaw's car include driving with an expired registration (Vehicle and Traffic Law § 401), operating a vehicle on public roads without insurance (Vehicle and Traffic Law § 319 [1]), or driving with suspended license plates (Vehicle and Traffic Law § 402) – all of which are traffic infractions, not crimes. The Vehicle and Traffic Law clearly differentiates between traffic infractions and crimes (see Penal Law § 10.00; Vehicle and Traffic Law § 155 ["(a) traffic infraction is not a crime"]). Because the trooper justified the stop on the basis of traffic infractions as well as crimes, we must evaluate each under the legal standard appropriate to it.

[7] Consequently, the dissent's claim that Ingle "*held* that a traffic stop based on 'a violation of the Vehicle and Traffic Law' is permissible when founded on 'reasonable suspicion'" is specious (dissenting op at 6 [emphasis added]). Ingle's holding is that when an officer has no reason to stop a vehicle other than to conduct a routine traffic check, the stop is lawful "only when conducted according to nonarbitrary, nondiscriminatory, uniform procedures for detecting violations" (36 NY2d at 415). While incongruously claiming that our "exceptionally precise" decision in Ingle

such a stop was unlawful. Precision as to which standard to apply to the stop was not at issue, and indeed the Ingle Court intermittently used both "probable cause" and "reasonable suspicion" where neither was involved. Unsurprisingly, then, Robinson had no reason to mention Ingle. Our recognition that probable cause is necessary, rather than just sufficient, for a stop based on a traffic infraction therefore does not amount to a "sea change" or "shifting course" (dissenting op at 2, 18).[8] We merely recognize what Robinson did

---

(dissenting op at 7 n 3) has engendered widespread "inconsistency" (dissenting op at 17), the dissent repeatedly mischaracterizes the holdings of our precedents in an attempt to alter Ingle's holding. People v Singleton, for example, was a case involving an officer's reasonable suspicion of criminality – not a traffic infraction (41 NY2d 402, 404 [1977]). Similarly misleading is the dissent's reliance on People v Martinez (dissenting op at 7). Not only was the stop there unlawful, but the "propriety of the stop [was] irrelevant" to the case's holding (People v Martinez, 37 NY2d 662, 669 [1975]). Quite simply, neither Ingle nor any other of our precedents holds that an officer may stop a vehicle based on reasonable suspicion of a traffic infraction.

[8] The dissent's laundry list of cases purportedly supporting its view that reasonable suspicion is applied "across the board" in New York (dissenting op at 7-8) does not withstand scrutiny (see e.g. People v Carvey, 89 NY2d 707, 710 [1997] [holding the vehicle stop valid where the officer had personally observed – and therefore had probable cause to believe there was – a missing rear license plate]; People v Batista, 88 NY2d 650 [1996] [holding the vehicle stop valid where the officers had personally observed the car running a red light]; People v May, 81 NY2d 725, 727-728 [1992] [holding that the officers had no legal basis to stop the car because a stop is "proper only if the officers had a reasonable suspicion of criminal activity"]; People v Coutin, 78 NY2d 930 [1991] [holding the stop was valid because the officers had reasonable suspicion of criminal activity]). In People v Chilton, the defendant was charged with several violations of the Vehicle and Traffic Law, including driving while intoxicated, unlicensed operation and an unsafe lane change. The Town Court dismissed the charges, finding that there was no probable cause for the stop. Although the County Court upheld that determination, it applied the reasonable suspicion standard. Our holding was an affirmance of the intermediate appellate court's finding that there was no reasonable suspicion *of any violation of law* for the stop because the mixed question presented was "beyond the review powers of this court" (69 NY2d 928, 929 [1987]). Rather than supporting the

impliedly and the Appellate Division departments, as a consequence, have done expressly:

erased any dicta in <u>Ingle</u> that have sometimes been read to permit stops for traffic

infractions based on less than probable cause. To the extent there exists any inconsistency

between <u>Robinson</u> and <u>Ingle</u>, any uncertainty by commentators, or any "confusion among

the courts" (dissenting opinion at 17), stopping a vehicle for a traffic infraction requires

probable cause; stopping a vehicle for suspicion of criminal activity requires less:

"reasonable suspicion that the driver or occupants of the vehicle have committed, are

committing, or are about to commit a crime" (<u>Spencer</u>, 85 NY2d at 753).


## II.

The trooper here did not observe any violations of the Vehicle and Traffic Law and

"everything looked good." Putting aside the result of the license plate inquiry, "[t]he

trooper candidly testified that he had had no reason to stop defendant" (<u>People v Ingle</u>, 36

NY2d at 420). It is clear, then, that without the result of the license plate inquiry the stop

of Mr. Hinshaw would have been unlawful and "the evidence obtained by that seizure

[could] not be used as evidence against him" (<u>id.</u>).

---

dissent's view, these cases show that our articulation of the bifurcated standard fully comports with the holdings in every one of our prior precedents. Our dissenting colleague's citation to <u>Sobotker</u> to support a federal-centric view of reasonable suspicion also cuts to the contrary: there, we held that the police unlawfully stopped the defendant's vehicle, while noting that "if patience rather than precipitancy had prevailed, the reward of good police work might well have been a seizure which the continued observation had rendered no longer devoid of a factual predicate for a founded belief that criminal conduct was under way" (<u>Sobotker</u>, 43 NY2d at 564-565).

The result of the license plate check provided neither probable cause to conclude a traffic infraction had occurred nor any basis for an objectively reasonable belief that criminal behavior had occurred or was afoot. Although the People and our dissenting colleague argue that the trooper understood the "generic" impound notification to require further investigation as to its cause, the trooper's speculation that the car could have been impounded for "registration . . . problems," the "plates could have been suspended," "insurance could have been suspended," or the vehicle could have been stolen was just that – pure speculation.[9] Indeed, the absence of any underlying Vehicle and Traffic Law violation from the database inquiry result undermined those unsupported hypotheses. The trooper's general knowledge, training, and experience (dissenting op at 28) is completely untethered from the question at hand: the objective reasonableness of his conclusion that the response to the license plate inquiry meant a traffic law had been violated or a crime had been, or was about to be, committed. In fact, the trooper testified that he had minimal prior experience with such impound notifications, thus undercutting the proposition that he could objectively conclude from such a notice that a violation or crime had occurred or was

---

[9] Although the dissent recognizes that it is the contents, rather than the mere existence, of a database report that may supply reasonable suspicion (dissenting op at 26, citing People v Bushey, 29 NY3d 158, 160 [2017]), the dissent relies on Bushey for the proposition that the contents of the report here – stating that the vehicle should not be treated as stolen and that no further action should be taken – supplied at least reasonable suspicion. That misunderstands our holding in Bushey; there, unlike here, the contents of the database report supplied the officer with probable cause of a traffic infraction before the stop of the defendant's vehicle (id.).

imminent.[10] The trooper's subjective belief that the impound was based on some violation or illegality, honestly held, is insufficient unless it rests on some objective basis (see generally People v Edwards, 14 NY3d 741, 742 [2010]). The trooper provided no such basis, and indeed never testified that any one of the hypothesized offenses pertained to Mr. Hinshaw.

The trooper's list omitted perfectly innocent – and just as likely – explanations as to why an impound notice might appear in a license plate search, including the actual reason in this case: Mr. Hinshaw lawfully recovered his car from the impound lot, and the system still had not corrected the status nearly two weeks later. A car may be impounded for a variety of reasons independent of a violation of the Vehicle and Traffic Law or Penal Law. The police may impound a car for the safety of the vehicle and its contents (see People v Tardi, 28 NY3d 1077, 1078 [2016]), or when necessary to protect public safety; such community caretaking is "totally divorced from the detection, investigation, or acquisition of evidence" of criminal conduct (see Cady v Dombrowski, 413 US 433, 441 [1973]). Impounded cars are commonly towed for non-criminal reasons, such as unpaid parking tickets, parking in "no parking" zones or streets temporally designated for parades, public events, filming or bus routes or, as suggested by Tardi, "public safety." That Mr. Hinshaw's car had at one point been impounded by the Buffalo Police Department,

---

[10] The cases cited by our dissenting colleague are ones in which an officer's directly relevant experience provided a sufficient foundational basis for the officer to draw an objective conclusion. Here, in contrast, the trooper testified as to his limited experience with impound notices, and he was not a member of the Buffalo Police Department, the originator of the impound notification.

therefore, did not provide the trooper a reasonable suspicion of criminality. Moreover, there were no facts establishing an objective basis to believe that the apparent removal or release of the vehicle from the impound lot was indicative of criminality. Reasonable suspicion "may not rest on equivocal or 'innocuous behavior' that is susceptible of an innocent as well as a culpable interpretation" (People v Brannon, 16 NY3d 596, 602 [2011]). Because "there was not even a suggestion that the conduct of the defendant or his companions had been furtive in character before the police interfered with their car's progress," and "the record here is bare of any objective evidence of criminal activity as of the time of the stop" (Sobotker, 43 NY2d at 564-565), the stop of Mr. Hinshaw's vehicle was invalid.

***

The trooper here lacked probable cause to believe Mr. Hinshaw had committed a traffic violation and identified no "credible facts establishing reasonable cause to believe that someone has violated a law" (Robinson, 97 NY2d at 354). Accordingly, the order of the Appellate Division should be reversed, Mr. Hinshaw's motion to suppress granted in its entirety, and the indictment dismissed

People v Hinshaw (Robert)

No. 46

STEIN, J. (concurring in result):

I concur with my colleagues in the majority to the extent they conclude that, under the circumstances here, the trooper lacked reasonable suspicion to justify the stop of defendant's vehicle insofar as the impound notification failed to supply an objectively reasonable basis for the trooper to believe that either the apparent impounding of the vehicle or its subsequent release from the impound lot was indicative of criminality.

However, because my colleagues inordinately focus on a legal question that the parties have not asked us to resolve and regarding which there is no present need for us to opine, I concur in result, only.

More specifically, the question of whether the trooper had—or was required to have—probable cause to suspect a traffic infraction is simply not before us on this appeal. County Court held that the impound notification provided the state trooper with "the requisite reasonable suspicion that criminality was afoot." The Appellate Division likewise concluded that the stop was supported by "reasonable suspicion" (170 AD3d 1680, 1681 [4th Dept 2019]). Neither court addressed whether the trooper had probable cause to suspect the driver had committed a traffic infraction.

Before this Court, defendant posits that "the lawfulness of the vehicle . . . stop depends on whether [the state t]rooper . . . possessed at least a reasonable suspicion that [defendant], or his passenger, had committed, were committing, or were about to commit, a crime." Similarly, the People argue only that reasonable suspicion supported the stop on the ground that "the [impound] alert required further investigation to determine its cause" insofar as it was suggestive of "the following crimes" (emphasis added), citing only to violations of the Vehicle and Traffic Law that constitute misdemeanor crimes (see e.g. Vehicle and Traffic Law §§ 319 [2]; 355; 392; 403 [1]; 512) or Penal Law offenses. Neither party engages in any analysis of whether probable cause is necessary, or merely sufficient, to support a vehicle stop based on a suspected traffic infraction—or whether this Court has, in fact, previously decided that issue. Therefore, in my view, the question of the required level of suspicion for such a stop is not properly before us (see generally Misicki v

Caradonna, 12 NY3d 511, 519 [2009]) and our determination thereof should await a case in which it is squarely presented and briefed by the parties.

It is a basic tenet of our jurisprudence that courts should resolve appeals within the framework of the arguments litigated by the parties and adjudicated by the courts below (see Deutsche Bank Natl. Trust Co. v Flagstar Capital Mkts., 32 NY3d 139, 154-155 [2018]), and that courts should refrain from offering advisory opinions (see generally Matter of Hearst Corp. v Clyne, 50 NY2d 707, 713 [1980]). This case provides no cause for us to depart from these longstanding rules—particularly if, as the majority asserts, the Appellate Division departments regularly require a motor vehicle stop for a suspected traffic infraction to be supported by probable cause (see e.g. Matter of Deraway v New York State Dept. of Motor Vehs. Appeals Bd., 181 AD3d 1150, 1151 [4th Dept 2020]; People v Wyatt, 153 AD3d 1371, 1372 [2d Dept 2017], lv denied 30 NY3d 1024 [2017]; People v Driscoll, 145 AD3d 1349 [3d Dept 2016]; People v Guzman, 78 AD3d 568, 569 [1st Dept 2010], lv denied 16 NY3d 831 [2011]). Under these circumstances, where many of our courts already are providing the highest level of protection available to affected citizens subject to traffic stops, we need not act hastily to address a contentious point of law that is neither briefed by the parties nor necessary to our resolution of defendant's appeal.

In short, the only question presented here is whether the trooper's stop of defendant's vehicle was supported by reasonable suspicion of a crime. While I agree with the majority's determination of that issue, the majority's purported resolution of the additional question of whether New York law requires a higher level of justification for a

vehicle stop based on a traffic infraction is beyond the scope of this appeal and unnecessary to its holding that the trooper lacked even reasonable suspicion to support the stop. I, therefore, concur in result, only.

People v Robert Hinshaw

No. 46

GARCIA, J. (dissenting):

When a law enforcement officer runs a routine registration check and learns of an impound report that, in the officer's experience, signifies that the vehicle "should not be out on the road," does the officer have the minimal degree of suspicion necessary to

conduct a brief traffic stop? That simple question is the sole disputed issue in this ordinary traffic stop case. The Constitution answers yes; the majority answers no.

But the majority does not stop there. Announcing a sea change in New York constitutional law, the majority elevates the degree of suspicion required to conduct an arbitrary *subset* of traffic stops. The majority cannot identify the source, purpose, or value of its novel, bifurcated standard, nor does it engage in the disciplined, in-depth analysis that typically accompanies a significant pronouncement of state constitutional law. To make matters worse, its new paradigm is unnecessary to the resolution of this case; neither party advocates for a dual standard, and the majority need not apply one. The majority's dismissive treatment and gratuitous holding inflict damage not only on New York law, but on this Court's historic process for constitutional decision-making. I dissent.

I.

The relevant facts are simply stated. Following a traffic stop, several grams of marijuana and a loaded gun were discovered in defendant's vehicle. Defendant was arrested and charged with second-degree criminal possession of a weapon and unlawful possession of marijuana. The New York State Trooper (the Trooper) who conducted the traffic stop testified at a subsequent suppression hearing.

The Trooper was an experienced law enforcement officer. At the time of defendant's arrest, the Trooper was in his 24th year with the New York State Police. He had received extensive training, including training "involving identification and the use of firearms," "training with respect to the identification and recovery of marijuana," and weapons training every six months. Over the course of his career, the Trooper had made

"over a thousand" marijuana arrests and "around 30" arrests for illegal handguns. The Trooper's duties also included "Vehicle and Traffic Law enforcement," which involves performing "routine registration check[s]."

On November 8, 2014, while on uniformed patrol, the Trooper ran a routine registration check on a vehicle operated by defendant. The database returned a notification from the New York State Department of Motor Vehicles (DMV) that defendant's vehicle "ha[d] been reported as an impounded vehicle." The "date of impound" was listed as October 20, 2014—less than three weeks earlier. The impound report also indicated that it "should not be treated as a stolen vehicle hit" and that "no further action should be taken based solely upon this impounded response."

According to the Trooper, the impound report's directive—that "[n]o further action should be taken"—is a "generic message" generated by the DMV that appears "even though" there is a "problem[]" with a vehicle. That standard message, the Trooper explained, appears not only on impound reports, but also "in connection with a number of different registration reports," including reports that a vehicle has been stolen, impounded, or has a problem with its registration. The Trooper further testified that, based on his experience, it "doesn't happen a lot" that a routine registration check reveals an impound report. When asked what an impound report "mean[s] to [him] as a New York State Trooper," the Trooper stated: "I have an impounded vehicle, I'm going to conduct my investigation." In the Trooper words: "If it's coming back impounded, it should be in an impound lot. It should not be out on the road." The Trooper therefore conducted a traffic stop in order to "investigate further and find out what the problem is."

During the stop, defendant informed the Trooper that his vehicle had been previously reported stolen but, when asked for paperwork to show that the vehicle had been properly released from the impound, defendant "couldn't produce anything."[1]  The Trooper detected an odor of burnt marijuana from within the vehicle and observed, in the center console cup holder, a bottle containing burnt marijuana residue, a "roach," and wrapping paper.  A subsequent search uncovered approximately three or four grams of marijuana on defendant's person and a handgun under the driver's seat.

The suppression court determined that the Trooper was a credible witness—noting that defendant's sole witness was "unpersuasive"—and concluded that the traffic stop was lawful.  The Appellate Division affirmed (People v Hinshaw, 170 AD3d 1680 [4th Dept 2019]).

II.

To justify a traffic stop, a law enforcement officer "need[s] only reasonable suspicion—that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law" (Heien v North Carolina, 574 US 54, 60 [2014] [internal quotation marks omitted]; People v Ingle, 36 NY2d 413, 415 [1975]).[2]  As a "temporary

---

[1] The parties stipulated to the admission of a record from the Parking Violations Bureau for the City of Buffalo indicating that defendant's vehicle was removed from the impound lot on October 30, 2014 – just nine days before the traffic stop.  The parties were jointly informed by the Parking Commissioner that, when defendant's vehicle was released from the impound lot, defendant was "issued a receipt" and "[h]e was, as a matter of course, instructed to maintain that receipt in the vehicle" so that it could be shown in the event that the vehicle was later stopped.

[2] A routine database check of a vehicle's registration does not constitute a search and is therefore "permissible" even in the absence of "any suspicion of wrongdoing" (People v Bushey, 29 NY3d 158, 160 [2017]; United States v Miranda-Sotolongo, 827 F3d 663, 667

stop is of course less intrusive than an arrest" (People v Harrison, 57 NY2d 470, 476 [1982]), the requisite level of suspicion is "obviously less demanding than that for probable cause" (United States v Sokolow, 490 US 1, 7 [1989]; Alabama v White, 496 US 325, 330 [1990] [noting that "reasonable suspicion can arise from information that is less reliable than that required to show probable cause"]).  While an officer must have more than a mere hunch, the degree of suspicion necessary to justify a traffic stop is "minimal" (Ingle, 36 NY2d at 415; Kansas v Glover, 589 US __, __, 140 S Ct 1183, 1188 [2020] ["(t)he reasonable suspicion inquiry falls considerably short of 51% accuracy" (internal quotation marks omitted)]; Illinois v Wardlow, 528 US 119, 123 [2000] [reasonable suspicion requires only "a minimal level of objective justification for making the stop"]).

In lieu of that well-established framework, the majority needlessly announces a novel constitutional standard under the guise of settled law.  Ignoring decades of relevant authority, the majority casually asserts that its bifurcated test—which imposes a more stringent standard where a stop is based on a suspected "traffic violation" rather than a suspected "crime" (see majority op at 3-4)—is already well-settled in New York (majority op at 8).  That demonstrably false contention distorts our precedent and ignores the contrary views of countless litigants, judges, and commentators.  Worse, the majority's dual standard serves no identifiable purpose and requires line-drawing exercises that make little sense as a policy matter, and even less sense as a practical matter.  And, in the end, the

---

[7th Cir 2016] ["A police officer's check of a vehicle registration in a database is not a Fourth Amendment search"]).

issue is entirely superfluous; it is not raised or briefed by the parties, and it is not necessary to the majority's holding.

A.

Here is the relevant context the majority conceals:

The "reasonable suspicion" standard derives from the United States Supreme Court's well-known decision in Terry v Ohio (392 US 1 [1968]). In Terry, the Court acknowledged that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest" (id. at 22). The Court therefore upheld a "brief, though far from inconsiderable, intrusion" (id. at 26) despite the absence of probable cause—applying, for the first time, the lower "reasonable suspicion" standard.

New York courts have adopted Terry's "reasonable suspicion" standard, and even applied it to traffic stops. More than forty years ago, in People v Ingle, this Court held that a traffic stop based on "a violation of the Vehicle and Traffic Law" is permissible when founded on "reasonable suspicion" (36 NY2d at 414). The Ingle Court—"relying upon the Terry case"—analogized a brief detention during a street encounter (a "Terry stop") to the "limited seizure" that results from a traffic stop (id. at 418). Thus, the Court held, when "singling out a particular automobile and its operator for a stop and an inspection to determine compliance with the Vehicle and Traffic Law" (id. at 416), reasonable suspicion is likewise required:

> "It should be emphasized that the factual basis to support a stop for a 'routine traffic check' is minimal. An actual violation of the Vehicle and Traffic Law need not be detectable. For

example, an automobile in a general state of dilapidation might properly arouse suspicion of equipment violations. All that is required is that the stop be not the product of mere whim, caprice, or idle curiosity. It is enough if the stop is based upon 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion'"

(id. at 420, quoting Terry, 392 US at 21.) The upshot of Ingle is that "[a] single automobile traveling on a public highway may be stopped . . . when a police officer reasonably suspects a violation of the Vehicle and Traffic Law" (id. at 414; see also People v Martinez, 37 NY2d 662, 668 n 5 [1975] ["In People v Ingle, we held that '(a) single automobile traveling on a public highway may be stopped for a 'routine traffic check' when a police officer reasonably suspects a violation of the Vehicle and Traffic Law'"]; Barry Kamins, New York Search and Seizure § 5.02 [1] [a] [2019 ed] ["In People v Ingle, the New York Court of Appeals held that a police officer may not stop an automobile for a 'routine traffic check' unless he reasonably suspects a violation of the Vehicle and Traffic Law"] [emphasis omitted]).[3]

In the ensuing decades, New York courts consistently applied Ingle's "reasonable suspicion" standard to traffic stops across the board, regardless of the nature of the suspected violation (see People v Carvey, 89 NY2d 707, 710 [1997]; People v Batista, 88

---

[3] The Court in Ingle did not "intermittently use[] both 'probable cause' and 'reasonable suspicion'" to describe the relevant standard (majority op at 11). In fact, the Court was exceptionally precise with respect to its terminology, pointing out that, in an earlier Pennsylvania decision, an officer's suspicion was inaptly "characterized as probable cause" even though it was "no different than the reasonable suspicion" that provides "the basis" for a routine traffic stop (Ingle, 36 NY2d at 420). The Ingle Court, by contrast, was perfectly clear: a traffic stop is permissible when based on "reasonable suspicion" of a "violation of the Vehicle and Traffic Law" (id. at 414).

NY2d 650, 653-654 [1996]; People v Spencer, 84 NY2d 749, 753 [1995]; People v May, 81 NY2d 725, 727-728 [1992]; People v Coutin, 78 NY2d 930, 932 [1991]; People v Falciglia, 75 NY2d 935, 936-937 [1990]; People v Sobotker, 43 NY2d 559, 563 [1978]; People v Singleton, 41 NY2d 402, 404 [1977]; People v Simone, 39 NY2d 818, 819 [1976]; Martinez, 37 NY2d at 668 and n 5; People v Deacon, 226 AD2d 1120, 1120-1121 [4th Dept 1996]; People v Bianchi, 208 AD2d 551, 551-552 [2d Dept 1994]; People v Riggio, 202 AD2d 609, 610 [2d Dept 1994]; People v Smith, 197 AD2d 860, 860 [4th Dept 1993]; People v Gales, 187 AD2d 606, 606 [2d Dept 1992]; People v Benbow, 170 AD2d 456, 456 [2d Dept 1991]; People v Ceballos, 175 AD2d 315, 315 [3d Dept 1991]; People v Phillips, 159 AD2d 326, 326 [1st Dept 1990]; People v Hines, 155 AD2d 722, 724 [3d Dept 1989]; People v Hoffman, 135 AD2d 299, 301 [3d Dept 1988]; People v Millan, 118 AD2d 236, 243 [1st Dept 1986]).  A "temporary stop," this Court noted, "is of course less intrusive than an arrest and thus *does not require probable cause*" (Harrison, 57 NY2d at 476 [emphasis added]).

This Court even made clear that a traffic stop based on "alleged *traffic infractions*" is evaluated under the "reasonable suspicion standard"—*not* "probable cause" (People v Chilton, 69 NY2d 928, 929 [1987] [emphasis added]).  In Chilton, "[t]he suppression court found a lack of *probable cause* to stop [the] defendant's van for alleged traffic infractions" (id. [emphasis added]).  On appeal, County Court held that "[t]he suppression court erroneously relied upon the probable cause standard" and therefore modified the order to "reflect [that] the legal standard is one of reasonable suspicion, not probable cause."  Affirming that decision, this Court determined that "the County Court properly held that

the legality of the stop"—a stop based on "alleged traffic infractions"—"should be measured against a reasonable suspicion standard" (69 NY2d at 929).[4]

Relying on Ingle, Chilton, and their progeny, New York courts routinely held that "[a] police officer may stop an automobile based upon a reasonable suspicion that the occupants of the vehicle have committed a violation of the law, *including traffic violations*" (Phillips, 159 AD2d at 326 [emphasis added] [citing Ingle]; Riggio, 202 AD2d at 610 [holding that "the police officer had a reasonable suspicion" to stop the defendant's vehicle based on suspected traffic infractions]; Gales, 187 AD2d at 606 [citing Ingle and holding that "the officer had reasonable suspicion that the driver was operating the vehicle in violation of the Vehicle and Traffic Law"]; Hines, 155 AD2d at 724 [citing Ingle and holding that "(a) police car may properly stop a vehicle . . . based upon reasonable suspicion of a violation of the Vehicle and Traffic Law"]; Hoffman, 135 AD2d at 301 [citing Ingle and holding that the defendant's conduct "clearly supported a reasonable suspicion that a violation of Vehicle and Traffic Law § 1120 (a) had occurred"]; Millan, 118 AD2d at 243 [holding that "(d)riving through a red light" supplies "reasonable suspicion" that "justifies

_____

[4] The Court in Chilton did not affirm on the ground that "there was no reasonable suspicion of *any violation of law*" (majority op at 11-12 n 8). The opinion is clear: the defendant's vehicle was stopped "for alleged traffic infractions," and the "proper[]" standard was "reasonable suspicion" (Chilton, 69 NY2d at 929). Indeed, the testimony of the arresting officer confirms that the vehicle was stopped solely because the driver repeatedly "crossed the stagnated pavement markings," which, the officer believed, constituted a traffic infraction (see Vehicle and Traffic Law § 1128 [a] [providing that "(a) vehicle shall be driven as nearly as practicable entirely within a single lane"]).

the stop of an automobile"]; see also Carvey, 89 NY2d at 710 [citing Ingle and holding that the vehicle was "lawfully stopped" because "it was missing a rear license plate"]).[5]

The Supreme Court eventually adopted Ingle's logic, extending Terry's "reasonable suspicion" standard to traffic stops (see Berkemer v McCarty, 468 US 420, 439 [1984] [noting that "the usual traffic stop is more analogous to a so-called 'Terry stop' than to a formal arrest" (citation omitted)]).  From that point on, it was, for many years, "settled law that reasonable suspicion is enough to support an investigative traffic stop" (United States v Lopez-Soto, 205 F3d 1101, 1104 [9th Cir 2000]; see also Berkemer, 468 US at 439).

Confusion regarding that well-established standard can be traced back to the Supreme Court's decision in Whren v United States (517 US 806 [1996]).  In Whren, the defendants "accept[ed] that [the officer] had probable cause to believe that various provisions of the . . . traffic code had been violated," but argued that the traffic stop was nonetheless invalid because the officer's asserted grounds for stopping the vehicle were "pretextual" (id. at 809-810).  Rejecting that argument, the Court determined that an otherwise lawful traffic stop does not violate the Fourth Amendment, even if an officer uses the stop as a "pretext[] for pursuing other investigatory agendas" (id. at 811).  The Court therefore upheld the traffic stop, remarking that "ulterior motives" do not "invalidate

---

[5] The majority asserts that this Court's prior articulation of the standard – requiring "at least reasonable suspicion" to conduct a traffic stop – somehow supports the majority's holding that "stopping a vehicle for a traffic infraction requires probable cause; stopping a vehicle for suspicion of criminal activity requires less" (majority op at 7-8 n 3, 12).  That tortured reading of our precedent is entirely unsupported.  The natural reading of those statements is the accurate one: reasonable suspicion is necessary to conduct a traffic stop; anything greater is therefore sufficient.

police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred" (id.).

By indicating that "'the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred,'" the "dictum" of the Whren Court "raised some doubt" regarding the settled "reasonable suspicion" standard (United States v Delfin-Colina, 464 F3d 392, 396 [3d Cir 2006], quoting Whren, 517 US at 810 [emphasis added]). In the aftermath of Whren, a number of federal courts were confronted with an argument that the Supreme Court was "shifting gears" by "requiring 'probable cause' as the predicate for a traffic stop" (id.).

Nearly all of the federal circuits have now rejected that contention and held that, notwithstanding the dicta in Whren, "reasonable suspicion of a traffic violation can support a traffic stop" (United States v Stewart, 551 F3d 187, 192 [2d Cir 2009]; see also United States v Chaney, 584 F3d 20, 24 [1st Cir 2009]; United States v Southerland, 486 F3d 1355, 1358-1359 [DC Cir 2007]; Delfin-Colina, 464 F3d at 396; United States v Lopez-Moreno, 420 F3d 420, 430 [5th Cir 2005]; United States v Martin, 411 F3d 998, 1001 [8th Cir 2005]; United States v Sandridge, 385 F3d 1032, 1036 [6th Cir 2004]; United States v Chanthasouxat, 342 F3d 1271, 1275 [11th Cir 2003]; United States v Callarman, 273 F3d 1284, 1287 [10th Cir 2001]; Lopez-Soto, 205 F3d at 1104). Many of these decisions emphasized the limits of Whren's holding: "The Whren Court did not state that a decision to stop an automobile is reasonable *only* when the police have probable cause to believe that a traffic violation has occurred"; it "noted instead that probable cause was *sufficient* to render the stop reasonable" (Stewart, 551 F3d at 192). The Supreme Court has since

validated that interpretation, indicating that an officer "need only 'reasonable suspicion'" to justify "[a] traffic stop for a suspected violation of law" (Heien, 574 US at 60; see also Rodriguez v United States, 575 US 348, 354 [2015]).

State courts that adopted Whren have inherited the same conflict. Employing Whren's dicta, many state courts "occasionally discussed whether a traffic stop was constitutional in terms of probable cause" (State v Styles, 362 NC 412, 415 [2008]; see also State v Houghton, 364 Wis 2d 234, 249 [2015] [noting "(t)he existence of multiple standards necessary to justify traffic stops in Wisconsin"]; State v Williams, 401 Md 676, 689 [2007] ["This Court has mentioned both standards in terms of traffic stops"]). Those courts eventually recognized that, "[s]ubsequent to Whren, federal courts have continued to hold that reasonable suspicion remained the necessary standard for stops based on traffic violations" and therefore clarified that, as a matter of state law, "reasonable suspicion is the appropriate standard" (Styles, 362 NC at 415-416 ["In accord with every federal circuit to consider this issue, we hold that reasonable suspicion is the necessary standard for traffic stops"]; Houghton, 364 Wis 2d at 249-250 [holding that "reasonable suspicion that a traffic law has been or is being violated is sufficient to justify all traffic stops" and rejecting the defendant's contention that a "dual standard provides proper protection to citizens' Fourth Amendment rights"]; Williams, 401 Md at 690 ["Most of the courts that have chosen, or been required, to determine which of those standards applies to a routine traffic stop, including a Whren stop, have held that probable cause is *not* ordinarily required and that the stop is justified under the Fourth Amendment if the officer had a reasonable articulable suspicion that a traffic law has been violated"]; see also State v Thompson, 284 Kan 763,

773 [2007]; State v Chavez, 2003 SD 93, 95 [2003]; State v Bohannon, 102 Haw 228, 237 [2003]; State v Golotta, 178 NJ 205, 212-213 [2003]; Commonwealth v Deramo, 436 Mass 40, 42-44 [2002]; State v Theetge, 171 Vt 167, 170 [2000]; People v Ramos, 13 P3d 295, 299 [Colo 2000]). Explaining the discrepancy, state courts noted that "[t]he references to probable cause in some of the Supreme Court cases," as well as in subsequent state court cases, "are in the context of simply noting the obvious—that if the officer has probable cause, the stop is reasonable—and not as an indication that probable cause is the minimum standard for such a stop" (Williams, 401 Md at 690-691).

B.

In New York, the trouble began with People v Robinson (97 NY2d 341 [2001]). There, the Court was asked to consider whether to "adopt Whren v United States as a matter of state law" (id. at 346 [citation omitted]). In other words, the disputed issue concerned whether an otherwise lawful traffic stop violates the New York State Constitution where "the underlying reason for the stop might have been to investigate some other matter" (id.).[6] Adopting Whren, the Court in Robinson determined that "[n]one of the reasons for extending protections of our Constitution beyond those given by the Federal Constitution exist here" and therefore, even if a stop is pretextual, it "does not violate the Fourth

_____

[6] The defendants in Robinson advocated for a standard that would examine the subjective intent of police officers – i.e., a "motivation"-based test. They did *not* argue that New York should "require *more* than probable cause" (majority op at 4). In fact, defendant Robinson's brief properly articulates the reasonable suspicion standard: "Police may not stop a car absent reasonable suspicion that a car's occupants have been, are then, or are about to be engaged in conduct in violation of law" (Brief for defendant-appellant in People v Robinson, 97 NY2d 341 [2001], available at 2001 WL 34151599).

Amendment" where the officer "has probable cause to detain a person temporarily for a traffic violation" (id. at 348, 351, citing Whren, 517 US 806). Like many other state courts, the Robinson Court embraced Whren's holding and, regrettably, employed Whren's problematic dicta—dicta contradicted by decades of New York precedent.

Like the Whren Court, the Robinson Court did *not* consider the standard applicable to vehicle stops based on suspected traffic violations. It did not need to; the defendants in Robinson, like the Whren defendants, conceded that "probable cause existed warranting a stop of the vehicle for a valid traffic infraction" (Robinson, 97 NY2d at 349). In addition, like the Whren Court, the Robinson Court did *not* hold that probable cause was necessary to conduct a traffic stop. Rather, as in Whren, the Court noted only that probable cause was *sufficient* to effectuate a stop based on a suspected traffic violation (id. at 346). And contrary to the majority's view, the Robinson Court did *not*, either explicitly or "impliedly" (majority op at 12), announce a heightened State standard for VTL-based traffic stops.

Historically, when this Court announces that we are not "in lockstep with federal constitutional standards" (majority op at 7), or that we have "rejected" longstanding precedent (majority op at 10), we do not do it quietly—much less impliedly (see e.g. Brooke S.B. v Elizabeth A.C.C., 28 NY3d 1, 14 [2016]; People v Class, 67 NY2d 431, 433 [1986]; People v P.J. Video, 68 NY2d 296, 303-304 [1986]; People v Gokey, 60 NY2d 309, 312 [1983]; People v Elwell, 50 NY2d 231, 235 [1980]). And despite the majority's claims, "[n]othing in Robinson . . . even hints at such a global change" in the well-established principle that reasonable suspicion governs traffic stops under state and federal law (People v Prado, 2 Misc 3d 1002[A], *9 n 7 [Sup Ct, NY County 2004] [noting that

"the requisite standard of proof of the traffic violation" was not "at issue" in either Robinson or Whren]). Quite the opposite; the Court in Robinson expressly declined to "extend[] the rights of New York State defendants beyond those of the Federal Constitution" (Robinson, 97 NY2d at 351; see also majority op at 4 [noting that the Robinson Court "declined" to provide greater protection than the Federal Constitution]). Nor did Robinson somehow abrogate Ingle (majority op at 10). Indeed, Robinson never once mentioned Ingle. Of course, had the Robinson Court intended to change the "long-standing constitutional standard" for traffic stops—or impose a drastic departure from federal law—"the issue, in all probability, would have been addressed directly" (Prado, 2 Misc 3d 1002[A], *9 n 7; see also Lopez-Soto, 205 F3d at 1104 ["If the Supreme Court announced in Whren a new rule of law . . . we would expect it to have acknowledged the change and explained its reasoning. Such an explanation is notably absent from the Whren opinion."]).

Undeterred, the majority rewrites Robinson's history. It ignores the long line of New York cases applying Ingle's "reasonable suspicion" standard to traffic stops. It does not acknowledge Robinson's background, limitations, or conflict with decades of precedent. And it does not even mention Whren, let alone the parallel conflicts that have played out in federal and other state courts. Instead, the majority decontextualizes Robinson's holding and extrapolates a heightened State standard from a case that expressly *declined* to establish a heightened State standard.

The majority makes the unremarkable observation that some lower courts and litigants have, in an exercise of caution, applied the heightened "probable cause" standard

mentioned in <u>Robinson</u> (<u>see</u> majority op at 8-10; <u>see also</u> <u>Matter of Deveines v New York State Dept. of Motor Vehs. Appeals Bd.</u>, 136 AD3d 1383, 1385 [4th Dept 2016]; <u>People v Polanco</u>, 57 Misc 3d 147[A], *2 [App Term, 2d Dept, 9th & 10th Jud Dists 2017]; <u>People v Paniccia</u>, 61 Misc 3d 397, 400 [NY City Ct 2018]).  Many others, however, have done the opposite.  Indeed, in an upcoming case before this Court, the People observe that <u>Robinson</u>'s holding—that "probable cause was *sufficient* to justify the traffic stop"—has caused the "unintended" consequence of suggesting that the Court had "announc[ed], *sub silentio*, a departure from both Supreme Court precedent, and this Court's own precedent" (People's Brief at 19, <u>People v Pena</u>).  As a result, they ask us to clarify that "[t]he standard in New York must still be reasonable suspicion because this Court has not announced such a drastic departure from <u>Ingle</u> or the Federal standard" (<u>id.</u> at 20).

A number of New York courts—including this Court—have reaffirmed that interpretation, holding that <u>Robinson</u> "should not . . . be seen as an abandonment of the rule of <u>Ingle</u>" that the "police may stop a vehicle when they possess reasonable suspicion to believe the driver has committed a traffic violation" (<u>Prado</u>, 2 Misc 3d, *9 n 7; <u>People v Abad</u>, 98 NY2d 12, 16 [2002] ["Automobile stops . . . historically have been founded upon an officer's reasonable suspicion of illegal activity"]; <u>People v O'Hare</u>, 73 AD3d 812, 813 [2d Dept 2010] ["A police officer may stop a car . . . if the officer has a reasonable suspicion that a traffic infraction has been committed"]; <u>People v Rorris</u>, 52 AD3d 869, 870 [3d Dept 2008] ["It is well settled that the police may lawfully stop a vehicle based on a reasonable suspicion that there has been a Vehicle and Traffic Law violation"]; <u>People v Morel-Gomez</u>, 33 Misc 3d 1220[A], *6 [Sup Ct, Bronx County 2011] ["(I)t is well-established

that the legality of a stop based on a traffic infraction is measured against a reasonable suspicion standard and not probable cause"]; see also Matter of Schoonmaker v New York State Dept. of Motor Vehs., 165 AD3d 677, 678 [2d Dept 2018]; People v Kindred, 100 AD3d 1038, 1039 [3d Dept 2012]; People v Allen, 90 AD3d 1082, 1084 [3d Dept 2011]; People v Jones, 63 AD3d 1643, 1644 [4th Dept 2009]; People v Davis, 58 AD3d 896, 897 [3d Dept 2009]; People v Mannino, 47 Misc 3d 1216[A], *3-4 [Greene County Ct 2015]; People v Leinberger, 11 Misc 3d 142[A], *1 [App Term, 2d Dept, 9th & 10th Jud Dists 2006]; People v Kalwiss, 6 Misc 3d 129[A], *1 [App Term, 2d Dept, 9th & 10th Jud Dists 2005]).  Commentators, too, insist that it is settled law that "[p]olice officers need only reasonable suspicion, not probable cause, to justify the investigatory stop of a vehicle" (31 Carmody-Wait 2d § 173:343 [2020]; see also 2 Robert G. Bogle, Criminal Procedure in New York § 31:40 [2d ed 2019] [stating that it is "settled law" that a traffic stop requires "at least a reasonable suspicion that the occupants of the vehicle have, or are about to be engaged in conduct in violation of the law, including traffic violations" (emphasis added)]). The majority's faulty contention that this position has been "abandoned" statewide (majority op at 9 n 5) is, at best, an extreme mischaracterization of the legal landscape.

At minimum, the "apparent inconsistency between Ingle and Robinson has created confusion among courts" in New York (Barry Kamins, Is 'Ingle' on Life Support After 'Robinson' and 'Whren'?, NYLJ, March 30, 2018; see also Karen Morris & Nicole L. Black, Criminal Law in New York § 44:8 [4th ed 2019] [noting the conflicting authority among lower courts regarding whether "the Court's holding in People v Robinson effectively elevated the basis for judging the legality of a traffic stop from 'reasonable

suspicion' to 'probable cause'"]).  Even those lower courts applying a dual standard

recognize that the state of the law is "intolerably confusing" when it comes to traffic stops

(Paniccia, 61 Misc 3d at 399).  Yet the majority disregards this persisting debate among

litigants, judges, and commentators, claiming that its previously-unannounced legal

standard is now universally understood (majority op at 10).

Though it repeatedly renounces federal law, the majority's dual standard derives

from Whren—a federal case employing federal law.  That "probable cause" dicta has now

been disavowed by almost every federal circuit and by countless other high state courts

that responsibly revisited their traffic stop standards in the aftermath of Whren.  This Court,

though, opts to ignore this essential history and to elevate discredited federal dicta to State

constitutional prominence.

### C.

Tellingly, even the majority cannot decide when its "settled" standard was

purportedly announced.  First, the majority claims that "nothing has changed"; its standard

is "completely consistent" with "every one of our prior precedents" (majority op at 7 n 3,

8 n 4, 11-12 n 8).  Elsewhere, the majority acknowledges a conflict with precedent, but

contends that any conflicting cases were abrogated by People v De Bour (majority op at 5-

7)—a case concerning a street encounter (not a traffic stop) that was "supported by *less

than* reasonable suspicion" (40 NY2d 210, 211 [1976] [emphasis added]).  Shifting course

once again, the majority later asserts that its dual standard came about when Robinson

somehow "rejected" Ingle—apparently without even citing it (majority op at 10).  Next,

the majority suggests that the legislature authorized a bifurcated standard by clarifying that

"traffic infractions are not crimes" (majority op at 6, citing Vehicle and Traffic Law § 155).

Only its fifth and final explanation is, regrettably, accurate: the majority's dual standard

becomes the law of New York as of today, and without any semblance of a constitutional

analysis (majority op at 12).

To be clear, this Court has *never* before announced a departure from the traditional

reasonable suspicion standard, nor have we ever held that the degree of suspicion necessary

to conduct a traffic stop depends on whether the individual is suspected of a traffic

infraction or a crime (see New York Search and Seizure § 5.02 [1] [a] [noting that the issue

of whether "the reasonable suspicion standard has been replaced" has "never been litigated

before the Court nor has Ingle been overruled"]).  And for good reason.  The basic premise

of search and seizure law is that the degree of suspicion dictates the permissible scope of

the intrusion (Terry, 392 US at 18 ["The scope of the search must be 'strictly tied to and

justified by' the circumstances which rendered its initiation permissible"]; see also De

Bour, 40 NY2d at 222-223).  In other words, although traffic stops may be initiated based

on probable cause *or* reasonable suspicion, those based on reasonable suspicion must be

more limited in scope (see Rodriguez, 575 US at 354; United States v Sharpe, 470 US 675,

685 [1985]; Berkemer, 468 US at 439; see also United States v Place, 462 US 696, 709

[1983]; Florida v Royer, 460 US 491, 500 [1983]).  Under the majority's bifurcated rule,

however, differing levels of suspicion are required (probable cause versus reasonable

suspicion) for the exact same intrusion (a traffic stop) depending on accidents of legislative

organization.

Lacking any legal foundation, the majority manufactures a policy justification for its dual standard: the <u>Robinson</u> Court provided "greater protections" for "traffic infraction vehicle stops" in order to "curb potential discriminatory practices" (majority op at 5). As an initial matter, the <u>Robinson</u> Court did the exact opposite. The defendants in <u>Robinson</u> asked the Court to adopt a heightened standard (a "motivation"-based test) that would invalidate pretextual stops, and the Court *rejected* it in favor of the *less-protective* <u>Whren</u> approach (<u>Robinson</u>, 97 NY2d at 349). Indeed, the dissenters in that case lamented that <u>Robinson</u> "inadequately protect[ed] a core value of both the Fourth Amendment and this State's counterpart" by "permitting arbitrary exercises of discretion on the part of police officers to conduct investigative stops of vehicles on the pretext of pursuing violations of the Vehicle and Traffic Law" (<u>id.</u> at 360 [Levine, J., dissenting] [dissenting on the ground that "<u>Whren</u> should not be followed as a matter of State constitutional law"]). The <u>Robinson</u> dissent then proceeded to engage in a comprehensive State constitutional analysis—sidestepped by the majority here—and concluded that "various factors strongly weigh against adopting <u>Whren</u> and in favor of imposing a stricter standard as a matter of State constitutional law in cases involving pretextual traffic stops" (<u>id.</u> at 367).

In any event, a bifurcated standard does nothing to curb discriminatory practices. As the <u>Robinson</u> dissenters noted, the vast majority of infraction-based traffic stops—even pretextual stops—are already supported by probable cause, leaving the police with "wide discretion to engage in investigative seizures" (<u>see</u> <u>id.</u> at 363-364 ["the existence of probable cause that the infraction was committed is manifestly insufficient to protect against arbitrary police conduct"]). Presumably, that is why no one in <u>Robinson</u> asked for

a bifurcated standard, and why courts across the country have rejected it. To be sure, there are legitimate and effective ways in which this Court might curb discriminatory practices; a bifurcated standard is simply not one of them.

Nor does a bifurcated standard derive from De Bour—a case cited heavily by majority (majority op at 5-7) that goes conspicuously unmentioned by defendant, the People, the suppression court, and the Appellate Division. As an initial matter, De Bour did not even involve a traffic stop. Both the police officer and the defendant were on foot, and the Court's decision pertained to "the narrower area of investigative street encounters" (De Bour, 40 NY2d at 228 [Fuchsberg, J., dissenting]).

Additionally, contrary to the majority's suggestion (majority op at 5), De Bour did not disavow federal law or otherwise alter the constitutional "reasonable suspicion" standard. Rather, the Court in De Bour created two additional evidentiary standards *below* reasonable suspicion for less intrusive encounters, leaving reasonable suspicion untouched (40 NY2d at 216, 223 [noting that the encounter was "supported by less than reasonable suspicion"]). In cases both before and after De Bour, this Court has routinely cited Terry and its federal progeny in support of the proposition that reasonable suspicion supports a limited detention (e.g. People v William II, 98 NY2d 93, 98-99 [2002] [citing Terry]; People v Diaz, 81 NY2d 106, 109 [1993] [citing Terry]; People v Carney, 58 NY2d 51, 53-54 [1982] [citing Terry]; Harrison, 57 NY2d at 476 [citing Terry]; Sobotker, 43 NY2d at 563 [citing Terry]; Singleton, 41 NY2d at 404 [citing Terry]; Ingle, 36 NY2d at 418 [citing Terry]). In fact, the De Bour Court itself approvingly cited Terry in support of the reasonable suspicion standard (40 NY2d at 223). De Bour, then, has no relevance to this

case, and certainly provides no support for the majority's elevated standard for infraction-based traffic stops.

The majority's next proposed rationale is equally puzzling: requiring probable cause "comports with the legislature's directive that traffic infractions are 'not crimes'" and therefore their enforcement "does not carry the same governmental interest as the prevention of crimes" (majority op at 6, citing Vehicle and Traffic Law § 155). Initially, the absence of any citation to precedent confirms that the Court has never before announced this purportedly settled principle of New York law. In any event, the legislature itself explained that its instruction—that "a traffic infraction is not a crime"—was *not* intended establish a bifurcated standard for traffic stops (majority op at 6) but rather to clarify that any punishment for a traffic infraction "shall not be deemed for any purpose a penal or criminal punishment" (Vehicle and Traffic Law § 155). Of course, had the legislature intended to authorize a dual standard for traffic stops, it surely would not have chosen such a cryptic manner of doing so.

Moreover, the majority's purported rationale is easily debunked. Is the enforcement of certain intoxicated driving offenses (see Vehicle and Traffic Law § 1193 [1] [a] [traffic infraction]) really less important than the enforcement of offenses like loitering (see Penal Law § 240.35 [crime]) or transporting a slot machine (see Penal Law § 225.30 [crime])? And why should the heightened probable cause standard apply to some drunk driving offenses (see Vehicle and Traffic Law § 1193 [1] [a] [traffic infraction]) when reasonable suspicion is sufficient in others (see Vehicle and Traffic Law § 1192 [3] [crime])? These

questions, which go unanswered by the majority, showcase just a few of the many absurd applications of its bifurcated rule.

More importantly, how is an officer to know whether he suspects a seemingly drunk driver of "driving while intoxicated" (a crime) or "driving while ability impaired" (a traffic infraction)? Under the majority's rule, law enforcement officers are required to identify the precise statutory provision that was allegedly violated—and the legislature's exact "taxonomy" (majority op at 6)—all before conducting a brief, investigatory traffic stop. That rule is impractical, unworkable, and poses serious public safety concerns that have not been considered (or even acknowledged) by the majority.

The majority also fails to address the broader inconsistencies generated by its new standard. According to the majority's theory, the requisite level of suspicion for a traffic stop hinges on "the gravity of the crime involved" (majority op at 6 [emphasis omitted]; see also People v Britt, 34 NY3d 607, 627 [2019] [Wilson, J., dissenting]). Why, then, does the majority only differentiate traffic infractions? Why not distinguish between misdemeanors and felonies? Or between classes of misdemeanors and classes of felonies? Moreover, if the "same basic balancing is mandated" for both pedestrian and vehicle stops (majority op at 7), must we elevate the degree of suspicion required for street encounters that are based on suspected violations (rather than suspected misdemeanors or felonies)? Under the majority's rule, De Bour "level four" suspicion (probable cause) is apparently required to initiate a De Bour "level three" encounter (a Terry stop) that is based on a suspected violation, rather than a suspected crime. In other words, as of today, "De Bour

level three does not exist" with respect to "offenses that are not felonies or misdemeanors" (Britt, 34 NY3d at 628 [Wilson, J., dissenting]).

D.

Worst of all, this case presents no reason for the majority to articulate a novel standard for "infraction-based" traffic stops. Both parties assert arguments in terms of reasonable suspicion (see Defendant's Brief at 8 ["the lawfulness of the . . . stop depends on whether (the Trooper) possessed at least reasonable suspicion that (defendant), or his passenger, had committed, were committing, or were about to commit, a crime"]; People's Brief at 8 ["The evidence in the record below supports the reasonable suspicion determination"]), and neither party has raised or briefed the merits of a bifurcated standard.[7] Rather, defendant asserts that it is "undisputed" that the Trooper did not suspect a traffic violation (Defendant's Brief at 8), and the People do not disagree. Indeed, the People cite specific statutory provisions—none of which are traffic infractions—and expressly argue that the Trooper had adequate suspicion to investigate those possible "crimes" (People's Brief at 11).

The majority claims that "we are required to consider both prongs of th[e] bifurcated standard" because "the trooper justified the stop on the basis of traffic infractions as well as crimes" (majority op at 10 n 6). That is wrong. An accurate recitation of the record makes clear that the Trooper did not stop the car "to investigate whether the vehicle had

---

[7] The issue has, however, been fully briefed in a case scheduled to be heard by the Court in a matter of days (see People's Brief at 16-23, People v Pena; Defendant's Brief at 27, People v Pena).

registration problems, the license plates or insurance were suspended, or if the vehicle was, in fact, stolen" (majority op at 10 n 6). Rather, the Trooper testified that possible "reasons" the vehicle could have "be[en] impounded" in the first place included problems with the vehicle's registration, suspended plates or insurance, or a stolen vehicle report. But the reason for the traffic stop, the Trooper repeatedly testified, was to investigate why, despite triggering an impound notice, the vehicle was not "in an impound lot." Indeed, at the Appellate Division, there was "no dispute that the State Trooper here did not observe defendant committing any traffic infraction," and therefore the "only issue" was whether the Trooper "had reasonable suspicion that defendant had committed a crime" (170 AD3d at 1682 [Whalen, P.J., and Centra, J., dissenting]). Even the majority concedes that the Trooper "stopped the car based *solely* on the results of the license plate check," which "indicat[ed] the car may have been stolen" (majority op at 3 [emphasis added]; id. at 12 [noting that the Trooper "did not observe any violations of the Vehicle and Traffic Law"]). In other words, even under a dual standard, probable cause does not apply.

The majority's inartful holding also confirms that, despite paying lip service to probable cause, that language is entirely gratuitous. In its very first sentence, the majority holds that the Trooper lacked *either* reasonable suspicion *or* probable cause to stop defendant's vehicle (see majority op at 1). Of course, an officer who lacks a lesser degree of suspicion (reasonable suspicion) also, by definition, lacks a greater degree of suspicion (probable cause). The majority, then, could resolve this case by simply concluding that the Trooper lacked reasonable suspicion of either a crime or a traffic violation. Put differently, even if it was squarely presented by the parties—and it is not—a higher standard is

unnecessary to the resolution of this case. The majority's deliberate framing betrays its pretense for forcing a watershed constitutional ruling into a case that never remotely presented the issue.

## III.

Applying the proper standard, the impound report, viewed through the lens of an experienced trooper, supplied reasonable suspicion to conduct the traffic stop. The Trooper's registration check revealed that defendant's automobile was "reported as an impounded vehicle," listing a recent "date of impound." That report, the Trooper explained, meant that the vehicle "should be in an impound lot." Defendant's vehicle was not, however, in an impound lot; it was on the road. The report therefore supplied the Trooper with reasonable suspicion to conduct an investigatory traffic stop in order to determine why the vehicle was not in the impound lot (see Glover, 589 US at __, 140 S Ct at 1190 ["combining database information and commonsense judgments in this context is fully consonant with this Court's Fourth Amendment precedents"]). Indeed, it is well-established that the contents of a database report, produced though a routine registration check, supply at least reasonable suspicion to question the operator of a vehicle (see Bushey, 29 NY3d at 160 [information gleaned from "a government database" supplied "probable cause for the officer to stop the driver of the vehicle"]; see also Glover, 589 US at __, 140 S Ct at 1187 [reasonable suspicion justified a traffic stop where a registration check revealed that the vehicle's registered owner "had a revoked driver's license"]; United States v Broca-Martinez, 855 F3d 675, 676-677 [5th Cir 2017] [reasonable suspicion justified a traffic stop "after a computer search indicated the vehicle's insurance status was

'unconfirmed'"]; Miranda-Sotolongo, 827 F3d at 666 [reasonable suspicion justified a traffic stop where the defendant's "vehicle registration did not appear in the law enforcement database"]; United States v Cortez-Galaviz, 495 F3d 1203, 1206 [10th Cir 2007] [reasonable suspicion justified a traffic stop where "the state database . . . contained no information suggesting that the owner of the (vehicle) had insured it"]; United States v Sandridge, 385 F3d 1032, 1034 [6th Cir 2004] [reasonable suspicion justified a traffic stop where a license check "revealed that (the defendant) did not have a valid driver's license"]; United States v Stephens, 350 F3d 778, 779-780 [8th Cir 2003] [reasonable suspicion justified a traffic stop where "information obtained from a computer check" showed that "the vehicle's license plate tags were 'not on file'"]; United States v Vela, 2016 WL 305219, *1-2 [SD Tex, Jan. 25, 2016, No. 2:15-CR-429] [reasonable suspicion justified a traffic stop where the officer "ran a search on the vehicle's license plate" and "the result showed an 'unconfirmed' insurance status"]; Rutledge v Tessier, 2014 WL 5422205, *3 [ED Va, Oct. 22, 2014, No. 2:13-CV-470] [reasonable suspicion justified a traffic stop where the "vehicle was listed on the VCIN database as impounded or stored"], affd for reasons stated below 594 Fed Appx 209 [4th Cir 2015]).

The specific language of the impound report did not vitiate the Trooper's suspicion. While the report contained cautionary language that, on its face, might militate against reasonable suspicion, the Trooper credibly explained its significance: the language is a "generic message," generated by the DMV, that comes up "even though" a vehicle is stolen, impounded, or has a problem with its registration. That boilerplate warning, the Trooper noted, is displayed not only on impound reports, but also "on other responses"

even when there are "problems with a vehicle."  Accordingly, when an impound report is returned, it means that the Trooper "ha[s] an impounded vehicle" and that the vehicle "should be in an impound lot"—not on the road.

Importantly, the Trooper's testimony was not based on assumption or conjecture, but rather on decades of experience and accumulated expertise.  After all, the Trooper had been a member of the New York State Police for more than twenty years.  He had received considerable training, both "at the state police academy" and regularly throughout his career.  As a trooper, his duties included vehicle and traffic enforcement, which entails routine registration checks.  That extensive experience enabled the Trooper to knowledgeably testify regarding impound reports, their frequency, and their meaning.

On this record, the impound report—as understood by an experienced trooper, versed in the interpretation of registration reports—supports an inference of unlawful conduct and supplied the requisite objective and articulable factual basis to justify a brief investigatory traffic stop.[8]

IV.

_____

[8] Of course, this might be a different case if, for instance, evidence was presented that the DMV database frequently or systematically displayed inaccurate information (see Miranda-Sotolongo, 827 F3d at 670), or the report was so outdated as to render the Trooper's reliance on it objectively intolerable (see United States v Laughrin, 438 F3d 1245, 1248 [10th Cir 2006]).  To be sure, a vehicle cannot be subject to stop indefinitely simply because it was once impounded.  However, the Constitution gives officers "fair leeway for enforcing the law" (Heien, 574 US at 61 [internal quotation marks omitted]) and even tolerates reasonable mistakes (id. at 60-61; People v Guthrie, 25 NY3d 130, 134 [2015]).  Here, the Trooper's reliance on the DMV's impound report – outdated by less than two weeks – was objectively reasonable, particularly in the absence of any evidence that the database might be unreliable.

Despite overwhelming caselaw to the contrary, the majority suggests that the traffic stop was unlawful because an impound report cannot provide a valid basis for a traffic stop. That holding relies on a series of legal errors, factual inaccuracies, and irrelevant observations.

First, the majority dedicates the bulk of its analysis to the notion that a vehicle may be impounded for a variety of "non-criminal reasons" (see majority op at 14). That is true, but entirely irrelevant. For the Trooper's purposes, it makes no difference why the vehicle was initially impounded; it matters only that the vehicle should have been in an impound lot, but was not. As the Trooper explained, an impound report signifies that the vehicle "should be in an impound lot"—meaning "[i]t should not be out on the road." Because defendant's vehicle was on the road—and not in an impound lot, where it apparently belonged—the Trooper had reasonable suspicion to investigate.

Next, the majority inaccurately claims that the Trooper's testimony concerning the impound report, based on his experience, is a "subjective belief" lacking any place in an objective search and seizure analysis (see majority op at 14). But in virtually every case evaluating the propriety of police conduct, the court's analysis turns on "the officer's personal knowledge of the circumstances, evaluated *in light of his or her experience*" (People v Carney, 58 NY2d 51, 53-54 [1982] [emphasis added] [internal citation, quotation marks, and brackets omitted]; 4 Wayne R. LaFave, Search and Seizure § 3.2 [c] [5th ed 2017] ["(M)ay the experience and expertise of the officer making the arrest or search be taken into account in determining whether probable cause is present? The answer is yes."]). This "focus on the officer's personal observation and experience" has long been

"recognized" as a quintessential component of the suppression court's analysis (Carney, 58 NY2d at 54; see also People v Jones, 90 NY2d 835, 837 [1997] [noting that a "police officer's experience and training in drug investigations" is one of the "factors" that "may give rise to probable cause that a narcotics offense has occurred"]; People v Batista, 88 NY2d 650, 655 [1996] [holding that reasonable suspicion supported a frisk of the defendant based on "the officer's observation of what his personal experience taught him was a bulletproof vest on a person"]; People v Stewart, 41 NY2d 65, 67, 70 [1976] [holding that the intrusion was "justified" where, "(b)y virtue of his previous experience in numerous weapons arrests," the officer "determined that the source of the bulge was a gun in the defendant's left breast pocket"]; People v Alexander, 37 NY2d 202, 203-204 [1975] [holding that a seizure of narcotics was supported by probable cause where "the arresting officer was trained and experienced in narcotics police work"]).  The Supreme Court has similarly "made it clear that the expertise and experience of the officer are to be taken into account" in an objective Fourth Amendment analysis (4 Search and Seizure § 3.2 [c]; see also Jackson v United States, 302 F2d 194, 196 [DC Cir 1962] ["The question to be answered is whether such an officer in the particular circumstances, conditioned by his observations and information, and guided by the whole of his police experience, reasonably could have believed that a crime had been committed"]).  Accordingly, as in every other search or seizure case, the Trooper's experience is entitled to weight in evaluating his observations.

Although experience is typically critical in assessing an officer's suspicion, the majority dismisses *this* Trooper's experience on the ground that it is somehow not

"relevant" (see majority op at 13, 14 n 10). That unexplained assertion is belied by the record. According to the Trooper's testimony, he was in his 24th year with the New York State Police, serving in a role that involves vehicle and traffic enforcement and, naturally, routine registration checks. Based on years of enforcing the Vehicle and Traffic Law, the Trooper understood the impound report to mean that defendant's vehicle should not be on the road—testimony that is "directly relevant" (majority op at 14 n 10) to the question of whether the Trooper had the requisite suspicion to stop the vehicle (see Broca-Martinez, 855 F3d at 676-677 [holding that the defendant's vehicle was lawfully stopped based on an inconclusive database report where, "(b)ased on his experience using th(e) system," the officer "concluded that the vehicle was likely uninsured"]).

Relatedly, the majority's assertion that the Trooper "had minimal prior experience" with impound reports (majority op at 13) is directly refuted by the record. While the Trooper testified that impound reports do not "happen a lot"—signaling that the database is not inflated with inaccurate reports—he never indicated that his experience with impound reports, amassed over 24 years of running routine registration checks, was "limited" (majority op at 14 n 10). To the contrary, the Trooper's testimony establishes that he had sufficient experience with impound reports to enable him to appreciate their relative frequency as well as their import. The majority's disregard of the Trooper's experience in this case is, therefore, both legally and factually unfounded.

The majority next faults the Trooper for failing to divine the precise basis for the impound report, or rule out all "innocent" explanations, before conducting the traffic stop (see majority op at 14). But our minimal reasonable suspicion standard "does not require

absolute certainty" that unlawful conduct has occurred (People v Brannon, 16 NY3d 596, 602 [2011]).  "Police officers encounter situations of uncertain legality all the time" (Miranda-Sotolongo, 827 F3d at 668; see also Wardlow, 528 US at 126 [noting that the Fourth Amendment "accepts the risk that officers may stop innocent people"]; New Jersey v T.L.O., 469 US 325, 346 [1985] ["the requirement of reasonable suspicion is not a requirement of absolute certainty"]).  While uncertainty might not always justify the intrusion of a traffic stop, reasonable suspicion does not require an officer to "rule out the possibility of innocent conduct" (United States v Arvizu, 534 US 266, 277 [2002]; Broca-Martinez, 855 F3d at 681 [to "clear() the bar for reasonable suspicion," an officer "does not have to be certain a violation has occurred"]; Miranda-Sotolongo, 827 F3d at 669 [reasonable suspicion "does not require the officer to rule out all innocent explanations of what he sees"]; Cortez-Galaviz, 495 F3d at 1208 ["Reasonable suspicion requires a dose of reasonableness and simply does not require an officer to rule out every possible lawful explanation for suspicious circumstances before effecting a brief stop to investigate further"]; see also Alexander, 37 NY2d at 203-204 [rejecting the defendant's contention that "there was a lack of probable cause" even though "more than one inference may be drawn from the facts"]).  "The need to resolve ambiguous factual situations—ambiguous because the observed conduct could be either lawful or unlawful—is a core reason the Constitution permits investigative stops like the one at issue here" (Miranda-Sotolongo, 827 F3d at 669; Cortez-Galaviz, 495 F3d at 1206 ["(T)he resolution of particularized and objective yet still ambiguous—potentially lawful, potentially unlawful—facts is the central purpose of an investigative detention"]; see also Wardlow, 528 US at 125-126 [conduct

that is "ambiguous and susceptible of an innocent explanation" may justify a stop, as reasonable suspicion permits an officer to "briefly investigate further" in order to "resolve (an) ambiguity"]). Any other approach would hamstring officers from investigating equivocal facts—a classic and critical law enforcement function.

Put differently, the entire purpose of our "reasonable suspicion" analysis is to determine whether further investigation is permissible *despite* an officer's uncertainty. For that reason, a stop conducted in the face of ambiguity is permissible so long as the officer has identified "specific and articulable facts" that, "based on his experience," give rise to an inference of unlawful conduct (Brannon, 16 NY3d at 602; Miranda-Sotolongo, 827 F3d at 669 ["a stop conducted in the face of ambiguity is permissible so long as it remains sufficiently probable that the observed conduct suggests unlawful activity"]). More specifically, a database report—like an impound report—supplies reasonable suspicion to conduct a traffic stop *even if* the report is inconclusive or might be innocently explained (see Bushey, 29 NY3d at 164 [a DMV database report "supplied the officer a reason" to stop the defendant's vehicle despite "the possibilit(y) of database error" (citation and quotation marks omitted)]; Glover, 589 US at __, 140 S Ct at 1188 [traffic stop was permissible even though the deputy did not know whether the registered owner of the vehicle, whose license was suspended, was the vehicle's driver]; Broca-Martinez, 855 F3d at 680-681 [a "seemingly inconclusive report" from the database established reasonable suspicion to support a traffic stop even though the officer "was not positive" that the defendant was uninsured]; Miranda-Sotolongo, 827 F3d at 669 [traffic stop was supported by reasonable suspicion where the vehicle's registration did not appear in the database,

despite plausible "innocent explanations"—"recognized" by the officer—for the discrepancy]; Cortez-Galaviz, 495 F3d at 1204, 1206 ["the suggestive ambiguity of the particularized and objective information" gleaned from the database provided "sufficient information to justify a brief traffic stop" even though it did not "definitively indicate criminal activity"]; Vela, 2016 WL 305219, *1-2 [the officer "had reasonable suspicion to justify the traffic stop" where he "ran a search on the vehicle's license plate" and "the result showed an 'unconfirmed' insurance status"]; Rutledge, 2014 WL 5422205, *3 ["it was reasonable for the officers to stop to investigate" based on an "apparently incorrect report" that the vehicle "was impounded as abandoned"]; see also Sandridge, 385 F3d at 1036 [rejecting the defendant's argument that any reasonable suspicion stemming from a license check, run three weeks prior to the traffic stop, was "stale" by the time the stop was conducted]; Stephens, 350 F3d at 779, 780 [the police had "reasonable suspicion to stop the vehicle and investigate whether the vehicle was properly registered" where "information obtained from a computer database" showed that "the vehicle's license plate tags were 'not on file'"]). The majority's circular approach would require an officer to preemptively discern the outcome of an investigation, or at least disprove all non-criminal possibilities, before the investigation has even occurred.

Because uncertainty allows for (and often triggers) further investigation, the cautionary language in the impound report did not negate the Trooper's reasonable suspicion but rather, at most, introduced ambiguity that—weighed against the Trooper's experience-based testimony—warranted a brief traffic stop to speak to the vehicle's operator (see Brannon, 16 NY3d at 602; Glover, 589 US at __, 140 S Ct at 1188; Broca-

Martinez, 855 F3d at 681; Miranda-Sotolongo, 827 F3d at 669; Cortez-Galaviz, 495 F3d at 1206). The Constitution, of course, does not elevate boilerplate DMV disclaimers over decades of trooper experience. Indeed, while the impound report itself originated from a law enforcement agency, the generic "no further action" directive is "generated through [the] DMV" and, the Trooper explained, indiscriminately inserted on registration reports regardless of whether there is, in fact, a problem with the vehicle. Allowing that language to dictate the scope of an officer's suspicion transforms a perfunctory DMV message into an outright ban on commonsense police practices.

V.

Law enforcement officers are permitted, under the Constitution, to take sensible investigatory steps in response to encounters that raise suspicion to the trained eye. A trooper, conducting routine patrol duties, is not required to ignore a report that, in the trooper's experience, warrants further investigation. I would affirm.

Order reversed, defendant's motion to suppress granted in its entirety and indictment dismissed. Opinion by Judge Wilson. Chief Judge DiFiore and Judges Rivera, Fahey and Feinman concur. Judge Stein concurs in result in an opinion. Judge Garcia dissents and votes to affirm in an opinion.

Decided September 1, 2020