[949 NE2d 484, 925 NYS2d 393]

The People of the State of New York, Respondent, v Ernest Brannon, Appellant.

The People of the State of New York, Respondent, v Jose Fernandez, Appellant.

Argued March 23, 2011; decided May 5, 2011

## POINTS OF COUNSEL

*Legal Aid Society, Criminal Appeals Bureau,* New York City (*Karen M. Kalikow* and *Steven Banks* of counsel), for appellant in the first above-entitled action. The police lacked reasonable suspicion to stop and frisk appellant and probable cause to search his pocket where the officer merely observed the hinge and then observed and felt the outline of a closed pocketknife in

appellant's pocket. (*People v Dodt*, 61 NY2d 408; *People v Berrios*, 28 NY2d 361; *Terry v Ohio*, 392 US 1; *People v De Bour*, 40 NY2d 210; *People v Hollman*, 79 NY2d 181; *People v Howard*, 50 NY2d 583; *Florida v Bostick*, 501 US 429; *California v Hodari D.*, 499 US 621; *United States v Simmons*, 560 F3d 98; *People v Cantor*, 36 NY2d 106.)

*Cyrus R. Vance, Jr., District Attorney*, New York City (*David P. Stromes* and *Caitlin J. Halligan* of counsel), for respondent in the first above-entitled action. Defendant's claim is unreviewable, and in any event, the recovery of defendant's gravity knife was lawful. (*People v Ramirez-Portoreal*, 88 NY2d 99; *People v Chipp*, 75 NY2d 327; *People v Bora*, 83 NY2d 531; *People v Chestnut*, 51 NY2d 14; *People v Harrison*, 57 NY2d 470; *People v McRay*, 51 NY2d 594; *People v Francois*, 14 NY3d 732; *People v Greenidge*, 91 NY2d 967; *People v McIntosh*, 96 NY2d 521; *Pennsylvania v Mimms*, 434 US 106.)

*Center for Appellate Litigation*, New York City (*Barbara Zolot* and *Robert S. Dean* of counsel), for appellant in the second above-entitled action. I. The police officer's observations of the head of a knife protruding from a clip attached to appellant's pants pocket fell below the minimum standard necessary to establish reasonable suspicion that appellant possessed an illegal gravity knife because these observations were equally consistent with the knife being legal to possess; nor, even if the officer reasonably suspected the commission of a crime, was the officer justified in immediately seizing the knife, as he lacked probable cause for the search he conducted or reason to believe that appellant posed a danger to his safety. (*People v De Bour*, 40 NY2d 210; *Sibron v New York*, 392 US 40; *People v Cantor*, 36 NY2d 106; *People v Martinez*, 80 NY2d 444; *People v Carrasquillo*, 54 NY2d 248; *People v Mendez*, 68 AD3d 662; *People v Dreyden*, 15 NY3d 100; *United States v Irizarry*, 509 F Supp 2d 198; *People v Best*, 57 AD3d 279; *People v Sosa*, 20 Misc 3d 1140[A], 2008 NY Slip Op 51805[U].) II. Penal Law § 265.01 (1) is unconstitutionally vague both on its face and as applied to appellant because it fails to give a citizen adequate notice of the nature of the proscribed conduct and permits arbitrary and discriminatory enforcement. (*People v Shack*, 86 NY2d 529; *United States v Irizarry*, 509 F Supp 2d 198; *People v Stuart*, 100 NY2d 412; *People v Bright*, 71 NY2d 376; *Kolender v Lawson*, 461 US 352; *Grayned v City of Rockford*, 408 US 104; *People v Nelson*, 69 NY2d 302; *United States v Harriss*, 347 US 612; *Smith v Goguen*, 415 US 566; *People v Grogan*, 260 NY 138.)

*Cyrus R. Vance, Jr., District Attorney*, New York City (*David P. Stromes* and *Caitlin J. Halligan* of counsel), for respondent in the second above-entitled action. I. Defendant's claim is unreviewable, and in any event, the recovery of defendant's gravity knife was lawful. (*People v Bora*, 83 NY2d 531; *People v Chestnut*, 51 NY2d 14; *People v Harrison*, 57 NY2d 470; *People v McRay*, 51 NY2d 594; *People v Francois*, 14 NY3d 732; *People v McIntosh*, 96 NY2d 521; *People v Greenidge*, 91 NY2d 967; *People v Campbell*, 87 NY2d 855; *People v Bianchi*, 85 NY2d 1022; *People v De Bour*, 40 NY2d 210.) II. Penal Law § 265.01 (1), which criminalizes the possession of a gravity knife, is fully constitutional. (*United States v Irizarry*, 509 F Supp 2d 198; *People v Foley*, 94 NY2d 668; *People v Shack*, 86 NY2d 529; *People v Bright*, 71 NY2d 376; *United States v Batchelder*, 442 US 114; *Lanzetta v New Jersey*, 306 US 451; *United States v Harriss*, 347 US 612; *People v Munoz*, 9 NY2d 51; *United States v Mazurie*, 419 US 544; *People v Stuart*, 100 NY2d 412.)

**OPINION OF THE COURT**

PIGOTT, J.

In these appeals, we are asked to decide the level of knowledge a police officer must possess before, consistent with the principles articulated in *People v De Bour* (40 NY2d 210 [1976]), he or she has reasonable suspicion to believe an individual possesses a gravity knife, as opposed to other similar knives such as a pocketknife, and therefore is authorized to conduct a stop and frisk. The Penal Law identifies gravity knives\* as per se weapons and criminalizes the mere possession of one (*see* Penal Law § 265.01 [1]). We hold that the detaining officer must have reason to believe that the object observed is indeed a gravity knife, based on his or her experience and training and/or observable, identifiable characteristics of the knife. An individual may not be detained merely because he or she is seen in possession of an object that appears to be a similar, but legal object, such as a pocketknife.

### *People v Ernest Brannon*

On September 8, 2006, defendant was walking with a friend along West 122nd Street in Manhattan at approximately 6:00 P.M.

---

\* A gravity knife is defined as a knife with a blade that (1) "is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force" and that (2) "when released, is locked in place by means of a button, spring, lever or other device" (Penal Law § 265.00 [5]; *see People v Dreyden*, 15 NY3d 100, 104 [2010]).

Officer Kevin Blake and another officer, both in plain clothes, were on the same side of the street and dealing with children who were trying to manipulate the lock on a school yard gate. Blake testified that he observed the men and, in particular, noticed that defendant's behavior became "somewhat suspicious," evincing a desire to avoid walking near the officers. As defendant passed, Blake observed the hinged top of a knife in defendant's back pocket. He asked the men to stop twice before defendant complied. When defendant approached Blake, he saw the outline of a knife through the material of defendant's pocket. Upon questioning, defendant admitted that he had a knife in his pocket. Blake then frisked defendant and recovered the knife. Blake testified that upon inspection, he found that it was a gravity knife and arrested defendant.

Before trial, defendant moved to suppress the knife and a statement he made to the officer at the time of his arrest. At the suppression hearing, Blake testified that he had been an officer for 4½ years and had made approximately 10 arrests of his own for possession of a gravity knife and participated in two dozen other arrests for the same crime. He had observed in defendant's pocket what he believed to be a knife. On further questioning, he described it as a "typical pocket knife."

Supreme Court denied the motion to suppress, finding that, under the circumstances, the stop and search was proper. Defendant pleaded guilty and then appealed his conviction, arguing that the gravity knife and his statement should have been suppressed as the fruits of an illegal search and seizure. The Appellate Division affirmed, holding that "[t]he combination of defendant's suspiciously evasive conduct, the officer's observation that defendant was carrying what was at the least a large and possibly dangerous knife, and defendant's acknowledgment, in response to a proper common-law inquiry, that he had a knife, permitted the officer to conduct a self-protective frisk" (60 AD3d 498, 499 [1st Dept 2009]).

### People v Jose Fernandez

On February 24, 2007, while walking on Ludlow Street in Manhattan at approximately 12:30 A.M., defendant was stopped by Officer Daniel Hoffman, who observed defendant walking on the sidewalk with a knife clipped to his front right pants pocket, the top or "head" of the knife protruding in plain view. Before any questioning, Hoffman approached defendant, retrieved the knife from defendant's front pocket and asked defendant if he

had any other weapons. Defendant stated that he had another knife in his left jacket pocket. When questioned why he was carrying the knife, defendant answered it was for his protection. After retrieving both knives, Hoffman opened them, confirming they were gravity knives.

Defendant was charged with two counts of criminal possession of a weapon in the third degree. He thereafter moved to suppress the two knives recovered from him and statements he made to the police officer.

A suppression hearing was held at which Hoffman testified that he had been a police officer for four years and had made approximately 300 arrests involving gravity knives. In his career, he had examined around 200 gravity knives and described the difference between a gravity knife and other types of knives. He explained that gravity knives are often carried in such a way as to make them readily accessible. Hoffman testified that when he first saw the knife he believed it was a gravity knife because, based on his experience, this type of knife was typically carried with a clip on the outside of the pocket, and with the "head" of the knife "usually sticking up outside of the pocket."

Supreme Court denied the motion to suppress, finding that the officer had probable cause to recover the knife that he observed clipped to defendant's pocket. The court noted that the officer had concluded that the weapon was a gravity knife based on his experience, coupled with his observation of the clip and the "head" of the knife in plain view. The court also found that the officer lawfully reached into defendant's pocket to recover the second knife, once defendant stated that he had a second knife in his jacket pocket. The Appellate Division affirmed (60 AD3d 549 [1st Dept 2009]).

A Judge of this Court granted both defendants leave to appeal (15 NY3d 747 [2010], 15 NY3d 749 [2010]). We now reverse in *Brannon* and affirm in *Fernandez*.

## Reasonable Suspicion Standard

These cases are governed by our holding in *People v De Bour* (40 NY2d 210 [1976]), requiring that before a police officer may stop and frisk a person in a public place, he must have "reasonable suspicion" that such person is committing, has committed or is about to commit a crime (*id.* at 223). We have defined reasonable suspicion as "the quantum of knowledge to induce an

ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand" (*People v Cantor*, 36 NY2d 106, 112-113 [1975]). It may not rest on equivocal or "innocuous behavior" that is susceptible of an innocent as well as a culpable interpretation (*People v Carrasquillo*, 54 NY2d 248, 252 [1981]). A stop based on reasonable suspicion will be upheld so long as the intruding officer can point to "specific and articulable facts which, along with any logical deductions, reasonably prompted th[e] intrusion" (*Cantor*, 36 NY2d at 113).

Here, in each appeal, we are dealing with a statute that criminalizes the mere possession, and not use, of a gravity knife. At the same time, the possession of many similar objects, including other knives, is not illegal. Defendants argue that the police officers in each case did not have reasonable suspicion to believe that the defendant was carrying a gravity knife. Typically, one cannot tell if a knife is a gravity knife until the knife is opened. Reasonable suspicion, however, does not require absolute certainty that the knife the individual is carrying is a gravity knife. Rather, the issue is whether, under the circumstances, the officer possessed specific and articulable facts from which he or she inferred that the defendant was carrying a gravity knife.

■ In *Brannon*, although Blake testified that he was able to see a hinged top of a closed knife and observed the outline of a pocketknife in defendant's pocket, he was unable to testify that he suspected or believed it to be a gravity knife. To the contrary, he testified that it looked like a pocketknife. The officer's testimony therefore does not, as a matter of law, support the conclusion that he had a reasonable suspicion that the knife in defendant's pocket was unlawful.

■ On the other hand, in *Fernandez*, there is record support for the Appellate Division's conclusion that reasonable suspicion existed. The officer's attention was drawn to defendant, who was only 10 to 15 feet away, because the officer saw, in plain view, the "head" of a knife that was sticking out of and clipped to defendant's pants pocket. He testified, based on his experience that gravity knives are commonly carried in a person's pocket, attached with a clip, with the "head" protruding.

We have reviewed defendants' remaining contentions and find them without merit.

Accordingly, in *People v Brannon*, the order of the Appellate Division should be reversed, defendant's motion to suppress

granted and the indictment dismissed. In *People v Fernandez*, the order of the Appellate Division should be affirmed.

JONES, J. (concurring in *People v Brannon* and dissenting in *People v Fernandez*). Because a gravity knife can be indistinguishable from a lawful knife in appearance, and its illegality can only be ascertained by its operation, I would hold that a stop and frisk based on the mere observance of a portion of a knife and the experience of the arresting police officer is not supported by sufficient reasonable suspicion. Therefore, I concur with the majority's result in *People v Brannon*, but respectfully dissent in *People v Fernandez*, for the reasons below.

Penal Law § 265.00 (5) defines a gravity knife as: "any knife which has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force which, when released, is locked in place by means of a button, spring, lever or other device."

By its very definition, a gravity knife cannot be identified until it is operated because there is no inherently distinguishing mark or physical trait that would allow for the plain identification of a gravity knife. The only manner in which the possession of a gravity knife can be confirmed is when the knife is activated through "the force of gravity" or "centrifugal force." Therefore, until a gravity knife is operated, it can be easily mistaken for a pocketknife or folding knife (neither of which is unlawful to carry).

In *Brannon*, on September 8, 2006, while dispersing some young children from a school yard, Officer Blake testified that his suspicions were alerted when defendant "furtively mov[ed]" towards the curb to cross the street, an action he interpreted as an attempt to avoid the police (even though defendant never crossed the street). When he further observed defendant, the officer stated that he noticed a "[h]alf to a quarter of an inch" of "the back portion of the knife where the joint is. Where the blade extends from the handle," and concluded that defendant was carrying a "typical pocket knife." Based on these observations, Officer Blake forcibly stopped defendant when, without inquiry, he ordered him to place his hands against a fence. The pocketknife was tested and found to be a gravity knife.

In the accompanying case of *Fernandez*, while on patrol in a police vehicle on February 24, 2007, at 12:26 A.M., from 10 to 15 feet away, Officer Hoffman observed defendant with a knife clipped in his front right pants pocket. Specifically, Officer

Hoffman testified that he had seen "the clip, observed the top head of the knife and shiny metal," leading him to believe that defendant was carrying a gravity knife. The weapon was confirmed to be a gravity knife when the officer recovered it and "flick[ed] the knife open."

The majority distinguishes these two cases on the fact that the officer in *Brannon* testified that he observed a pocketknife while the officer in *Fernandez* testified to a belief that he had seen a gravity knife, and had training and experience based on 600 to 700 arrests, with approximately half of those arrests involving gravity knives. However, this minimal distinction is of no moment where both stops were premised on insufficient reasonable suspicion due to the lack of inherent criminality in the mere physical appearance of a gravity knife.

In *People v De Bour* (40 NY2d 210 [1976]), we outlined various levels of police interaction with the public and the accompanying standards required to justify such intrusion. To perform a lawful, level-three stop and frisk, a police officer must have "a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor" (*id.* at 223). While I acknowledge that reasonable suspicion does not require absolute certainty of a crime, it is equally true that "innocuous behavior" or conduct capable of innocent interpretation cannot serve as a basis for reasonable suspicion (*see id.* at 216). Thus, since a gravity knife can bear an unremarkable superficial similarity to other lawful knives and its illegality cannot be confirmed until its operation, the mere possession of a gravity knife is conduct susceptible to innocent interpretation.

The absence of an identifying physical trait makes it equally likely that an individual possesses a lawful knife as he or she may possess an unlawful one, and there is nothing within the respective records of these cases to indicate that the physical characteristics the officers observed were unique to, and shared by, gravity knives. That the officers viewed a clip, a metal portion, and a handle joint of a knife protruding from defendants' pockets is not so uncommon and innately criminal as to differentiate it from the lawful possession of a knife in one's own pants pocket. In fact, in *Fernandez*, the only testimony demonstrating any distinction between an illegal gravity knife and a lawful one is the difference in operation: "[A] [f]olding knife does not lock in place, a gravity knife does." The reasonable

inference to be drawn from this testimony is that the criminality of a gravity knife can only be verified upon inspection. And without a more specific basis, the observations here, based solely on police training and experience, border on "hunches" which can never constitute reasonable suspicion (*Terry v Ohio*, 392 US 1, 22 [1968]).

Additionally, a forcible stop is only justified so long as there are "specific and articulable facts which, alone with any logical deductions, reasonably prompted th[e] intrusion" (*People v Cantor*, 36 NY2d 106, 113 [1975]). In these cases, there were no specific facts supporting the beliefs that defendants were carrying gravity knives, and justifying the forcible stops. In *Brannon*, the officer simply had no basis to conclude that defendant was carrying a gravity knife. The allegedly "furtive" movement of defendant and the mere observation of a knife believed to be a "typical pocket knife" did not supply the reasonable suspicion needed to justify the forcible stop (*see People v Mendez*, 68 AD3d 662, 662-663 [1st Dept 2009]). Similarly, in *Fernandez*, the officer's testimony was conclusory as there were no specific facts to support his belief that defendant possessed a gravity knife. The mere fact that a knife may have a clip or has a metal portion cannot be considered an identifying trait of gravity knives. Rather, too much credence is given to the training and experience of the officer without evidence of specific, articulable facts indicating the presence of a gravity knife. Quite simply, the only observation the officer was justified in making was that defendant was carrying a knife; there was no other indication of criminality. Without further evidence that the knife in question possessed intrinsic characteristics that would signal its illegality as a gravity knife, there was no basis to escalate the observation to a forcible stop of defendant.

The likely result of the majority's holding is that it will establish a catechism for the admission of gravity knife evidence, permitting the admission of evidence with a minimal basis for reasonable suspicion—the conclusory observations of a police officer. The finding of reasonable suspicion based solely on testimony regarding the training and experience of the officer and the belief that a gravity knife was present is highlighted in recent cases. In *Mendez*, the Appellate Division held that evidence should be suppressed because the officer's testimony indicated a belief that the defendant was carrying a "folding knife" (68 AD3d at 662-663), whereas in *People v Neal* (79 AD3d 523 [1st Dept 2010]) and *People v Herrera* (76 AD3d 891 [1st

Dept 2010]), the court concluded there was reasonable suspicion because training and experience led the respective officers to believe it was "more likely than not it was a gravity knife" (*Neal*, 79 AD3d at 523).

The weight given to an officer's training and experience is evident here, in *Brannon* and *Fernandez*, as both officers similarly observed minute, innocuous portions of a knife, but concluded differently on the criminal nature of the weapons. In my view, had the officer in *Brannon* merely testified that he believed a gravity knife, and not a pocketknife, was present, then the outcome in that case would have been different. Instead of requiring the police and the People to articulate a specific factual basis for reasonable suspicion justifying these stops, in these types of cases, prosecutors will now be encouraged to present police officers who can describe their training and experience with gravity knives, and testify that a gravity knife, and not a "typical pocket knife," was observed. Given the highly intrusive nature of these stops, the acceptance of these conclusory statements at *Mapp/Dunaway* hearings as a minimal basis for the admission of evidence poses a significant danger (*People v Howard*, 147 AD2d 177, 181-182 [1st Dept 1989] [court held that conclusory statements by officers at hearings were "rote recital(s) of the words deemed necessary to retroactively validate a patently improper search"]).

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, READ and SMITH concur with Judge PIGOTT; Judge JONES concurs in result in a separate opinion.

In *People v Brannon*: Order reversed, etc.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, READ and SMITH concur with Judge PIGOTT; Judge JONES dissents in a separate opinion.

In *People v Fernandez*: Order affirmed.