# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 96
The People &c.,
   Respondent,
    v.
Joshua Messano,
    Appellant.

Sara A. Goldfarb, for appellant.
Bradley W. Oastler, for respondent.

RIVERA, J.:

Defendant asserts that County Court should have granted his motion to suppress physical evidence found in his car as a direct result of defendant's unlawful seizure by

police. The prosecution counters that even if the officers lacked reasonable suspicion of defendant's involvement in criminal activity, what appeared to be drug-related contraband was in plain view on the driver's seat, justifying the search of his car. We conclude that the search was unconstitutional because the prosecution failed to establish that the police had reasonable suspicion to detain defendant and failed to meet its burden of showing that the police observed the contraband in plain view.

I.

Defendant Joshua Messano was indicted on one count of second-degree criminal possession of a weapon under Penal Law § 265.03 after the police recovered a loaded handgun from the back seat of the car he was driving. Following his indictment, defendant moved to suppress the gun as the fruit of an unlawful detention and search.

During the suppression hearing, Detective Bryan Hart testified that he was patrolling a Syracuse neighborhood around 6:40 pm when he observed a car driving through traffic faster than the other drivers on a busy road. This car crossed the double-yellow line and pulled up to another car stopped in traffic and driven by defendant. Hart observed and overheard the two engage in a "loud conversation" and then pull into a parking lot where the businesses were closed. Hart positioned his unmarked car "approximately 50 to 75 yards" away. From there, he saw defendant exit the car he had been driving and stick his head through the other car's front passenger-side window several times while talking to that other car's driver. He further observed defendant looking around and texting on his phone. Based on his experience, Hart "believed" defendant had engaged

in a hand-to-hand drug-related transaction. However, he conceded on cross-examination that he did not actually see any such transaction between defendant and the other driver.

While Hart was observing the two men, a third car arrived and that car's driver exited. Hart knew this third person by name as someone who had previously been arrested for drug possession. Hart then contacted other officers to assist in approaching defendant and the other two men. A marked patrol unit and several other detectives responded. One of the responding officers, Deputy Conor Young, approached defendant, who was then seated in the driver's seat of his car. Young testified that, as he walked towards the car, defendant exited, closed the car door and began walking towards him. Upon the approach, Young frisked defendant "to make sure he had no weapons that could harm [the officer] or [his] partner," although Young acknowledged on cross-examination that defendant was not "threatening."

Young found nothing on defendant during the frisk and told him to stand at the rear of the car, where Young's partner, Deputy Dominick Albanese, was standing and "could maintain eyesight on [defendant]." Young testified that, at that point, defendant was not free to leave. Young then approached defendant's car, looked through the open driver's-side window and saw what he described as "a rolled dollar bill and white substance on the driver's side seat." Based on his training and experience, he concluded the powder was cocaine. Young told Albanese to arrest defendant, who was still standing with Albanese behind the car. Defendant was handcuffed and placed under arrest and his car immediately searched. The officers recovered a "clear baggy" of what Young believed to be narcotics in the front console and a handgun in the center armrest of the back seat. After

defendant was arrested, while he was still standing behind the car, Hart conducted a "secondary search" of defendant's person and recovered $1200 in cash.

Following the hearing, defense counsel argued that the police lacked reasonable suspicion to restrain defendant because the officers had merely observed him engaged in innocent behavior beforehand and that the plain view doctrine did not justify the search of defendant's car. County Court denied suppression. Defendant later pleaded guilty to second-degree criminal possession of a weapon.

A divided Appellate Division affirmed (213 AD3d 1307 [4th Dept 2023]). The majority concluded that: (1) Young had reasonable suspicion of defendant's involvement in a drug transaction based on Hart's observations as communicated to him, and therefore the detention outside defendant's car was not unlawful; and (2) even if defendant had not been detained, Young could have "simply walked up to the vehicle, looked in the window, and observed the drugs in plain view on the driver's seat" (*id.* at 1308). Two Justices dissented, concluding that there was no reasonable suspicion to detain defendant based on actions that "were at all times innocuous and readily susceptible of an innocent interpretation" (*id.* at 1310 [Whalen, P.J. and Bannister, J., dissenting] [internal quotation marks omitted]). The dissent also concluded that the officer's observation of the dollar bill and white powder on the driver's seat were not attenuated from defendant's detention at the back of the car because the latter was a continuation of the initial unlawful seizure which provided Young with an unobstructed view (*id.*).

One of the dissenting Justices granted defendant leave to appeal. We now reverse.

II.

The Fourth Amendment to the United States Constitution and Article I, § 12 of the New York Constitution prohibit "unreasonable searches and seizures" (US Const Amend IV; NY Const, art I, § 12). These provisions permit the police to conduct brief investigative stops of individuals in public places that fall under "an entire rubric of police conduct . . . which historically has not been, and as a practical matter could not be, subjected to the warrant procedure" (*Terry v Ohio*, 392 US 1, 20 [1968]), but only when there is "a particularized and objective basis for suspecting the particular person stopped of criminal activity" (*Navarette v California*, 572 US 393, 396-397 [2014]; *Terry*, 392 US at 21-22)—that is, "reasonable suspicion" of criminal activity based on "the totality of the circumstances" (*Navarette*, 572 US at 397 [internal quotation marks omitted]; *People v Cantor*, 36 NY2d 106, 112 [1975] ["Before a person may be stopped in a public place a police officer must have reasonable suspicion that such person is committing, has committed, or is about to commit a crime"], citing CPL 140.50). Reasonable suspicion is "that quantum of knowledge sufficient to induce an ordinarily prudent and cautious person under the circumstances to believe criminal activity is at hand" (*People v Martinez*, 80 NY2d 444, 448 [1992] [internal quotation marks and alterations omitted]). "It may not rest on equivocal or innocuous behavior that is susceptible of an innocent as well as a culpable interpretation" (*People v Brannon*, 16 NY3d 596, 602 [2011] [internal quotation marks omitted]).

Generally, as with searches, seizures of property "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the

Fourth Amendment—subject only to a few specifically established and well delineated exceptions" (*Minnesota v Dickerson*, 508 US 366, 372 [1993] [internal quotation marks omitted]). Among those " 'established' " exceptions is " 'that under certain circumstances the police may seize evidence in plain view without a warrant' " (*Arizona v Hicks*, 480 US 321, 326 [1987], quoting *Coolidge v New Hampshire*, 403 US 443, 465 [1971] [plurality]). Under this "plain view doctrine, . . . law enforcement officers may properly seize an item in 'plain view' without a warrant if[,]" in pertinent part, "they are lawfully in a position to observe the item" (*People v Brown*, 96 NY2d 80, 89 [2001]).[1]

"[T]he fundamental justification for the plain view doctrine is that when the police are already lawfully in a position to make the observation, the discovery and seizure of contraband in plain view involve no intrusion on the individual's constitutional rights beyond that already authorized by the warrant or some exception to the warrant requirement" (*People v Diaz*, 81 NY2d 106, 111 [1993], *abrogated on other grounds by Dickerson*, 508 US at 366). In other words, the police may seize incriminating evidence "if they had the right to be where they were when they saw it" (*Brown*, 96 NY2d at 88). That justification is absent—and the doctrine therefore does not legitimize a warrantless seizure of property—when an officer gains the vantage point from which they view incriminating evidence by violating a constitutional prohibition against unreasonable searches and

---

[1] An officer also must "have lawful access to the item itself when they seize it[,] and . . . the incriminating character of the item [must be] immediately apparent" (*Brown*, 96 NY2d at 89).

seizures (*see Horton v California*, 496 US 128, 136 [1990] ["It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed"]; *Brown*, 96 NY2d at 89 ["The constitutionality of a plain view seizure 'must turn on the legality of the intrusion that enables (police) to perceive and physically seize the property in question' "], quoting *Texas v Brown*, 460 US 730, 737 [1983] [alteration in original]).

When a defendant moves to suppress evidence seized by the police, the prosecution initially bears "the burden of [g]oing forward to show the legality of the police conduct in the first instance" (*People v Berrios*, 28 NY2d 361, 367 [1971] [internal quotation marks and citation omitted]). Moreover, since all seizures "presumptively are unreasonable *per se*, . . . where a warrant has not been obtained," the prosecution has "the burden of overcoming this presumption of unreasonableness" (*see People v Jimenez*, 22 NY3d 717, 721 [2014] [internal quotation marks and alterations omitted]). Here then, the prosecution had "the burden of demonstrating the legitimacy of the plain view seizure" (*Brown*, 96 NY2d at 90 n 6).

III.

Applying this established law to the record on this appeal, we conclude that Hart's observations—relayed to the other officers, including Officer Young—did not provide the police with reasonable suspicion that defendant was engaged in a drug transaction. Furthermore, Young was not justified in detaining defendant at the back of his car and there

is absolutely no record support for a determination that the dollar bill and white powder were in plain view. Lacking both reasonable suspicion of a drug transaction and a lawful vantage point from which Young could observe the items on the driver's seat, the police had no justification for the warrantless search of the vehicle.

According to Hart's testimony at the suppression hearing, on a summer day during daylight hours, Hart observed two men in their respective cars meet on the road, talk to each other through their car windows loudly over the traffic, then pull into an empty parking lot where defendant went over to the other car, put his head through the closest open window, and continued their conversation. Defendant also stood up, looked around, and used his phone. Crucially, although Hart "believed" defendant had engaged in a hand-to-hand drug transaction, he conceded that he never saw anything change hands between defendant and the other driver. Furthermore, no other record evidence or reasonable inferences to be drawn therefrom supported Hart's belief, as Hart testified that he made his observations from 50-75 yards away. Defendant's behavior, viewed in totality, was equivocal and susceptible of an innocent interpretation, and therefore could not form the basis for reasonable suspicion that he had engaged in a crime (*see Brannon*, 16 NY3d at 602).

Moreover, the arrival of the third driver who had previously been apprehended for drug possession could not provide reasonable suspicion because police did not observe defendant engage in a transaction with the third driver. "Guilt by association . . . has no place in our jurisprudence" (*Dorothy D. v New York City Probation Dept.*, 49 NY2d 212, 216 [1980]; *Joint Anti-Fascist Refugee Comm. v McGrath*, 341 US 123, 178 [1951]

[Douglas, J., concurring] [referring to "guilt by association" as "one of the most odious institutions of history"]), including our search and seizure jurisprudence (*see Sibron v New York*, 392 US 40, 62 [1968] ["The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security"]; *cf People v Johnson*, 64 NY2d 617, 618-619 [1984] ["(A) stop based on no more than that a suspect has previously been arrested for burglary and that there have been burglaries in the area is premature and unlawful"]).[2] Thus, at the time defendant was detained and the car searched, the police did not have evidence that defendant had even committed a violation of the Vehicle and Traffic Law, let alone a criminal offense (*see Navarette*, 572 US at 397; *Cantor*, 36 NY2d at 112). Therefore, as a matter of law, the officers' observations could not form the "minimum showing necessary to establish" a reasonable suspicion that defendant had committed or was about to commit a crime (*People v McCray*, 51 NY2d 594, 601 [1980]; *see also People v Johnson*, 40 NY3d 172, 175-176 [2023]).

That leaves only the prosecution's contention that even if, as we conclude, the detention of defendant at the back of the car was not lawful, the contraband on the driver's seat was nevertheless in plain view, thereby justifying the subsequent vehicular search.

---

[2] The dissent bemoans our references and supposed "attempt to analogize this case" to *Dorothy D.* (49 NY2d at 216) and *McGrath* (341 US 178) as evidence of our "disconnect from the record in this case" (dissenting op. at 7). In doing so, the dissent confuses the concept of analogy with our simple application of a broad legal principle universally embraced in free societies and embedded in our precedents—an application which *Sibron* (392 US at 62) tells us is proper when evaluating the constitutionality of an individual's encounter with the police.

This claim is without merit. At the suppression hearing, Young did not testify that he could see what was on the car seat from his vantage point as defendant approached him or during the frisk. Therefore, there is no record evidence or any reasonable inference that Young was in a position to view the contraband absent the unlawful detention of defendant (*see McCray*, 51 NY2d at 601; *Brown*, 96 NY2d at 90 n 6).

Young testified that it was only after defendant was detained at the back of the car that Young walked towards the driver's door and looked in the window. The only reasonable inference to be drawn from this testimony is that Young could see what was on the seat only by approaching the car door and looking in at the driver's seat. Indeed, Young's actions confirm this reading of the record because if it were otherwise Young would have ordered defendant's arrest after the frisk and before telling him to move.[3] Thus, the prosecution's assertion that the officer was justified in detaining defendant at the back of the car—allowing Young to easily view the driver's seat—is unsupported by the record. By Young's own account, when he ordered defendant to stand at the back of the vehicle, there was no evidence of a drug transaction—as he recovered none during the frisk—or

---

[3] The dissent ignores that, because the government failed to meet its burden, the record here is insufficient to establish reasonable suspicion for the detention (dissenting op at 4-5, 11). The prosecution also failed to meet its burden of establishing the propriety of this presumptively-invalid vehicular search on plain-view grounds (*see Brown*, 96 NY2d at 90 n 6). While the dissent acknowledges this burden (*see* dissenting op at 4-5), the dissent fails to give it proper consideration, as required by our precedents (*see Jimenez*, 22 NY3d at 721).

any basis to fear defendant, who Young admitted was not threatening and was compliant with the officer's commands.[4]

The Appellate Division reasoned that, even if Young had not detained defendant, he could have observed the contraband in plain view simply by walking up to the driver's seat and looking into the vehicle (*see Messano*, 213 AD3d at 1308). However, this conclusion is unsupported because, had the officers not unlawfully detained defendant behind the car, defendant could have walked back, opened the car door and sat on the driver's seat—actions that, contrary to the dissent's unsupported assertions (*see* dissenting op at 9-10), would have blocked Young's view of the contraband.[5] Therefore, the prosecution failed to meet its burden to establish at the suppression hearing that the unlawful detention of defendant was not the reason that Young had an "unobstructed view

---

[4] We have no occasion to opine on the legality of Young's frisk of defendant since it is irrelevant to whether the motion to suppress should have been granted. Moreover, the fact that Hart recovered cash from defendant post-arrest is irrelevant to the legality of this detention and the vehicle search because this discovery cannot retroactively legitimize an intrusion "that was not justified at its inception" (*People v Moore*, 6 NY3d 496, 498 [2006]).

[5] The dissent disagrees with our plain-view analysis and draws on *United States v Class* (883 F3d 734, 738 [2018]) for support (*see* dissenting op at 11). However, *Class* was a federal case that applied a different standard of review and involved a different burden allocation (*id.* at 738-739; *see also Ornelas v United States*, 517 US 690, 699 [1996]).

The core questions before us on defendant's appeal are whether, under New York precedent, as a matter of law, the officers' observations constituted the "minimum showing necessary to establish" reasonable suspicion (*McCray*, 51 NY2d at 601), and whether the prosecution met its burden to establish a lawful vantage point from which the police could engage in a plain-view seizure (*Brown*, 96 NY2d at 90 n 6). As we have thoroughly discussed, application of these proper standards compels a conclusion that the motion to suppress should have been granted.

of the driver's seat" (*Messano*, 213 AD3d at 1310 [Whalen, P.J., and Bannister, J., dissenting]).

IV.

For the reasons we discuss, the prosecution failed to carry its burden of overcoming the presumptive unreasonableness of the warrantless vehicular search (*Jimenez*, 22 NY3d at 721), including "demonstrating the legitimacy of the plain view seizure" (*Brown*, 96 NY2d at 90 n 6). Accordingly, the Appellate Division order should be reversed, defendant's motion to suppress physical evidence granted and the indictment dismissed.

GARCIA, J. (dissenting):

A police officer saw drugs in plain view on the seat of defendant's car, arrested him, and searched the vehicle. A loaded gun was recovered. The record supports the holdings by the lower courts that the officer, after receiving a report that defendant was engaged in

a drug deal, had the reasonable suspicion necessary to briefly detain defendant by his car and that even if he did not, the drugs were in plain view. Defendant's conviction for unlawful possession of a loaded gun should therefore be affirmed by application of our well-established standard for reviewing mixed questions of law and fact. But instead of looking to the ample record support for the lower courts' determinations the majority does the opposite, substituting its own view of the facts and drawing negative inferences from the record in order to reverse that conviction as a "matter of law." That error has consequences for the community, leading to suppression of the "physical evidence" (majority op at 12)—namely a loaded gun—and dismissal of the indictment. I dissent.

I.

The scene leading up to the seizure of the gun from defendant's car is not as antiseptic as portrayed by the majority. Detective Bryan Hart observed a Mercedes "driving erratically" through heavy traffic, and crossing a double solid line (or, as the majority would have it, "driving through traffic faster than the other drivers on a busy road" [majority op at 2]). That car pulled up to the car driven by defendant and Hart saw the drivers of the two vehicles have a shouted conversation before both turned into the parking lot of a closed business.

As Hart continued to watch the two men, he observed motions that he believed to be a hand-to-hand drug transaction. He saw defendant step out of his car, insert his head through the window of the other car, and have a conversation with the other driver. During this interaction, defendant alternated between texting on his phone, looking around, and talking to the other driver. Though Hart answered in the affirmative when asked on cross-

examination whether he did not "actually see" a hand-to-hand drug transaction, he testified that, based on his years of experience, including surveilling hundreds of such transactions, the interaction he observed "had the characteristics of a hand to hand drug transaction." When asked what these characteristics were, he responded, "*reaching in and out of a vehicle*, one person staying in the vehicle in order to stay within concealment, the other person being outside of the vehicle, *reaching in*, *hand to hand movements*." He also noted "[t]he nervousness of a person watching what's going on around them."

After watching this interaction in the otherwise deserted parking lot, Hart continued surveillance and a third car arrived in the parking lot. That third driver got out and went over to meet defendant and the other driver. Hart "immediately identified" the driver of the third car by name as someone who he knew had previously been arrested for drug possession. At that point, Hart relayed his observations to other officers and requested assistance, and four officers, including Deputies Young and Albanese, responded. Young testified that when he arrived at the parking lot, he saw three cars and three individuals. Defendant was sitting in the driver's seat of his car with the door open and the other two men were standing outside defendant's car.

As Young approached the three men, defendant got out of his car, closed the door, and walked toward him. At that point, Young performed a pat frisk which he testified was for "officer safety" and which yielded no weapons. Young then directed defendant to stand at the rear of the car. He acknowledged during cross-examination that at this point defendant was not free to leave. Next, Young "looked at the driver's side, the window was completely down, and observed a rolled dollar bill and white substance on the driver's side

seat." He testified that, based on his experience, the substance appeared to be cocaine. At this point, Albanese placed defendant under arrest and Albanese and Young searched the vehicle. They discovered drugs and a loaded handgun in the car.

Both the suppression court and the Appellate Division upheld the seizure, each court finding that Young had the requisite reasonable suspicion that defendant was involved in a drug deal and that, in any event, the drugs were in plain view on the car seat (213 AD3d 1307, 1308 [4th Dept 2023]).

## II.

We have made clear that lower court determinations of reasonable suspicion and plain view present mixed questions of law and fact beyond our review and that this "rule applies 'where the facts are disputed, where credibility is at issue *or where reasonable minds may differ as to the inference to be drawn*" (*People v Harrison*, 57 NY2d 470, 477 [1982], quoting *People v McRay*, 51 NY2d 594, 601 [1980] [emphasis added]; *see People v McLaren*, 62 NY2d 730, 731 [1984] [plain view determination involves a mixed question of law and fact which is not subject to further review by this court when supported by evidence in the record]).

Instead of applying this well-established standard, the majority repeatedly emphasizes that it is the People's initial burden to come forward with evidence showing the legality of the police conduct (*see* majority op at 2, 7, 10 n 3, 11). But while the People have that burden (*see People v Brown*, 96 NY2d 80, 90 n 6 [2001]), at this stage of the process they are entitled to every reasonable inference from the record in support of the lower courts' findings that they met that burden. This Court does not act as another

suppression court, marshaling and weighing the evidence to determine if the People met their burden of proof.   Rather, the only question for us is whether the lower courts' conclusion that they did meet that burden is supported by the record, affording the prevailing party all reasonable inferences.   Here, the record amply supports both holdings and we should affirm.

III.

Application of the correct standard demonstrates that there is record support for the lower courts' conclusion that Young had reasonable suspicion to justify the brief detention of defendant.   We have defined the "[r]easonable suspicion" required for a level three detention as "the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand" (*see People v Cantor*, 36 NY2d 106, 112-113 [1975]; *see also People v Brannon*, 16 NY3d 596, 601-602 [2011]).   "Reasonable suspicion" to detain—not the "probable cause" needed to arrest—was required here.

While correctly quoting from *Brannon* for the proposition that reasonable suspicion "may not rest on equivocal or innocuous behavior" (majority op at 5, quoting *Brannon*, 16 NY3d at 602), the majority omits the sentence that immediately follows: "A stop based on reasonable suspicion will be upheld so long as the intruding officer can point to 'specific and articulable facts which, along with any logical deductions, reasonably prompted th[e] intrusion' " (*Brannon*, 16 NY3d at 602, quoting *Cantor*, 36 NY2d at 113).   Crucially, the concept articulated in the missing sentence from the majority's *Brannon* quote is also missing from the majority's analysis.   Only after the proper standard for reviewing the

record has been applied will this Court consider whether, as a matter of law, that record supports the minimum showing necessary to establish the relevant standard (*see e.g. Harrison*, 57 NY2d at 477-478). By ignoring any reasonable inferences that do not benefit defendant, and drawing contrary inferences that do, the majority recasts a mixed question of law and fact as the "purely legal question" of whether the minimum showing was made and thereby evades our well established standard of review and overturns the rulings of the lower courts (*see People v Sivertson,* 29 NY3d 1006, 1007 [2017] [dissent "unduly emphasizes the testimony and resulting inferences that are favorable to defendant" in a mixed question case]).

A proper focus on the record—along with the reasonable inferences derived therefrom—demonstrates that Hart's testimony about what he did observe provided record support for the lower courts' finding of the requisite level of suspicion here. All of the circumstances—the erratic driving, the shouted conversation between the occupants of the two cars, both cars pulling into the parking lot of a deserted business, the interaction between defendant and the other driver that had, in this experienced officer's view, the hallmarks of a drug transaction, and the arrival of a third driver with a known prior drug arrest in the otherwise empty lot—add up, with all proper inferences granted, to record support for a finding of reasonable suspicion.

The majority takes a different approach. Rather than look to the entire record and draw any reasonable inferences in support of the lower courts' holdings (*see People v Benjamin*, 51 NY2d 267, 271 [1980] [looking to the totality of circumstances including information relayed in a radio call and observations at the scene in assessing reasonable

suspicion]), the majority attempts to individually catalogue each action and deem each one "not enough." For example, it is undisputed that the arrival of the third driver with a record of drug arrests could not, standing alone, provide the requisite level of suspicion. But of course, Hart did not premise his suspicion solely on defendant's association with a known drug offender, despite the majority's attempt to analogize this case to *Joint Anti-Fascist Refugee Comm. v McGrath* (majority op at 8-9, citing 341 US 123, 178 [1951] [Douglas, J., concurring]), a true "guilt by association" case involving membership in a group labeled "subversive" by the United States Government. Similarly, a person with a known history of narcotics arrests arriving at the scene where the officer believed a hand-to-hand drug transaction had just taken place and engaging with the other participants is in no way analogous to a refusal by a judge to expunge a baseless complaint filed out of spite against a juvenile solely because the judge concluded that the juvenile's sibling had a prior arrest (*see* majority op at 8-9, citing *Dorothy D. v New York City Probation Dept.*, 49 NY2d 212, 216 [1980]). Nor do the facts here compare with "a stop based on no more than that a suspect has previously been arrested for burglary and that there have been burglaries in the area" (*see* majority op at 9, quoting *People v Johnson*, 64 NY2d 617, 619 [1984]).

Certainly any "broad legal principle universally embraced in free societies" (majority op at 9 n 2) must be respected, but when invoked by a court it must also be relevant. Or, as *Sibron v New York* (392 US 40 [1968]), also cited by the majority for the "universally embraced" principle (majority op at 9 n 2), teaches: "[t]he constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in *the concrete factual context* of the individual case" (392 US at 59, 62 [officer

"merely saw (defendant) talking to a number of known narcotics addicts over a period of eight hours"] [emphasis added]).  Rather than providing legal support, the citations to those "guilt by association" cases are further evidence of the majority's disconnect from the record in this case.[1]

Similarly, the majority relies on the fact that Young recovered "no evidence of a drug transaction" during the frisk (majority op at 10) to negate the reasonable suspicion already established by Hart's observations.  The People never argued that reasonable suspicion developed after the pat down search.  The majority appears to wrongly equate Young's testimony that he recovered no weapon in that search with the conclusion that "[b]y [his] own account, when he ordered defendant to stand at the back of the vehicle, there was no evidence of a drug transaction" (*see* majority op at 10), conflating the justification for the pat search with the justification for the subsequent detention.  Young conducted the pat frisk for officer safety, not to investigate a possible drug transaction.  During the suppression hearing, Young was asked: "[Y]ou didn't find anything worrisome [during the pat search]" and he was careful to respond: "I did not identify anything that would indicate that [defendant] had *a weapon* on him."  The pat search would not have

---

[1] It is unclear what the majority means by asserting that the "association" proof fails only "because police did not observe defendant engage in a transaction with the third driver" (majority op at 8).  If the majority means observing a drug transaction between the two, that observation would provide officers with probable cause and that standard is not relevant here.  If the majority means observing them "interact," there is ample proof in the record that the third driver interacted with the other two individuals present in the otherwise empty parking lot.  If the majority means observing them interact in a way that suggests a drug transaction, that is exactly what the officer observed between the defendant and the other driver.

necessarily revealed the presence or absence of drugs on defendant's person.[2]  Nor did the fact that police did not find drugs or money on defendant when they frisked him rule out the possibility that the evidence remained in defendant's car when he left it to approach the officer.  Hart's observations prior to the pat down search were sufficient evidence in the record to support the finding of reasonable suspicion necessary for the brief detention, regardless of the results of that search.  In sum, the record, and the inferences drawn from the established facts, provide support for the lower courts' conclusion that Young had reasonable suspicion to briefly detain defendant.

## IV.

However, even if Young's detention of defendant had been unreasonable, Young nevertheless legally searched the car after he saw the drugs in plain view on the driver's seat.  Police "may properly seize an item in 'plain view' without a warrant if (i) they are lawfully in a position to observe the item; (ii) they have lawful access to the item itself when they seize it; and (iii) the incriminating character of the item is immediately apparent" (*People v Brown*, 96 NY2d 80, 89 [2001], citing *People v Diaz*, 81 NY2d 106, 110 [1993]; *Horton v California*, 496 US 128, 136-137 [1990]).  Only the first requirement is at issue here.  When the proper deferential standard of review is applied (*see People v Beriguette*, 84 NY2d 978, 980 [1994]), the record supports the conclusion that Young was lawfully in

---

[2] After his arrest, the police recovered approximately $1,200 from the defendant, further supporting the officer's testimony that the search was indeed done in a manner only to address officer safety and not to uncover evidence of a drug transaction.

a position where he could plainly see the drugs even absent the allegedly unlawful detention.

Defendant voluntarily got out of the car to approach the officer. Young and defendant were necessarily about the same distance from the car at the time of the frisk. After the frisk, Young told defendant to wait at the back of the car as he approached the driver's side door. The fair inference is that this all happened quickly: first the frisk and then Young walking ahead of defendant back to the driver's side window while telling defendant to stay by the back of the car.

Rather than engage with this rapidly developing scene, the majority concludes, in a few sentences, that there is "no record evidence or any reasonable inference that Young was in a position to view the contraband absent the unlawful detention of defendant" (majority op at 10). The majority reaches this conclusion for three reasons: (1) "Young could see what was on the seat only by approaching the car door and looking in at the driver's seat"; (2) the "prosecution's assertion that the officer was justified in detaining defendant at the back of the car—allowing Young to easily view the driver's seat—is unsupported by the record"; and (3) "had the officers not unlawfully detained defendant behind the car, defendant could have walked back, opened the car door and sat on the driver's seat" (majority op at 10-11).

The first two points are entirely irrelevant to the plain view analysis. The majority's first point is uncontested: no one argued below that the officers could see the contraband at any point before Young approached the door of the vehicle. The majority's second point goes to reasonable suspicion to detain the defendant, but at this stage of the analysis, the

unlawfulness of that detention is assumed. Instead, the only relevant issue is whether, despite that detention, Young was in a lawful position to observe the contraband (*see State v Graham*, 200 Conn 9, 20, 509 A2d 493, 499 [1985] ["The plain view 'search' of the car was wholly unconnected with the arrest other than by the fact that it occurred shortly thereafter"]).

The majority nevertheless concludes that but for the detention, Young would not have been in a position to see the drugs on the seat, speculating that had defendant not been detained, he could have rushed back to his car ahead of the officer, jumped into the driver's seat, and concealed the drugs with his body (majority op at 11). That supposition defies not only our standard of review, but common sense as well. Any attempt by defendant to sprint back to the car ahead of Young "would likely have aroused the officers' suspicion" further (*see United States v Class*, 883 F3d 734, 738 [8th Cir 2018] [plain view seizure of drugs from engine compartment was not causally related to prior unlawful detention and rejecting as "unlikely speculation" the argument that defendant could have abruptly closed the hood without raising suspicion]). Moreover, opening the car door in front of the officer in order to get back in would have made the view of the drugs plainer still.

*** 

Instead of affording the People all reasonable inferences in looking for record support for the holdings of the two lower courts, the majority reweighs the hearing testimony, and based on negative inferences and speculation, holds that the People did not meet their burden of proof. The majority's holding is unmoored to our standard of review and ignores the circumstances confronting the officers in that deserted parking lot. Public

safety will suffer (*see People v DeBellis*, — NY3d —, 2023 NY Slip Op 05964 [2023] [reversing conviction because defense lawyer failed to request instruction that defendant was on his way to turn his gun in to police even though defendant repeatedly lied to police about having a gun]).

Order reversed, defendant's motion to suppress physical evidence granted and indictment dismissed. Opinion by Judge Rivera. Chief Judge Wilson and Judges Troutman and Halligan concur. Judge Garcia dissents and votes to affirm in an opinion, in which Judges Singas and Cannataro concur.

Decided January 11, 2024