People v Zubidi (2026 NY Slip Op 00964)

People v Zubidi

2026 NY Slip Op 00964

Decided on February 19, 2026

Court of Appeals

Halligan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on February 19, 2026

No. 14 

[*1]The People & c., Respondent,
vAmado Zubidi, Appellant.

Barbara Zolot, for appellant.
Franklin R. Guenthner, for respondent.

HALLIGAN, J.

The defendant was convicted of four counts of criminal possession of a weapon in the second degree after being stopped while driving a minivan suspected of involvement in two prior criminal incidents. He contends that the stop was unlawful because the officers who pulled him over lacked reasonable suspicion that the driver or occupants of the vehicle had committed a crime. The record supports the Appellate Division's finding that the officers had reasonable suspicion to conduct the stop, based on the totality of the circumstances. We therefore affirm.I.
On April 28, 2019, an eyewitness called 911 to report an altercation between two drivers in the Washington Heights neighborhood of Manhattan. The eyewitness told the operator that a Hispanic male in his 20s or 30s driving a white Dodge Caravan had thrown a bottle and then fired a gun at the other car, and provided the license plate number of the vehicle. Police ran the license plate and learned that defendant Amado Zubidi was the registered owner of the vehicle and lived at an address on Baruch Drive on the Lower East Side of Manhattan.
The next day, a detective investigating the incident created an "I-Card" that identified the defendant as a suspect in the shooting. He also issued a BOLO ("Be On the Lookout") safety alert for the defendant's car because he "believed the vehicle was involved in a dispute with a firearm" and "wanted any officers that came in contact with the vehicle to be aware." The BOLO alert included the license plate number and a description of the vehicle.
Nearly three weeks later, on the morning of May 17th, a traffic agent saw a white Dodge minivan with the same license plate number illegally parked on Baruch Drive. The agent began the process of issuing a summons. As he approached the car with the summons, the car sped away, almost hitting him. The agent then called for assistance and four officers responded, including Officers Daniel Amaral and Joseph Stokes. The traffic agent described the vehicle and provided the officers with its license plate number.
Officer Amaral testified that he then "searched the license plate on [his police-issued phone] to look up any information on that vehicle that pertain[ed] to [the] plate number that the traffic agent gave to [him]." He "got DMV records describing it was a white Dodge caravan registered to an Amado Zubidi, and that the vehicle was wanted in connection to a road rage shooting in [Washington Heights]." Amaral also said he was able to access a description of the car and information indicating it was connected to "a Hispanic male that was armed and dangerous." According to another officer, Officer Stokes told him that he suspected that the car's driver "ran from the traffic agent" that morning because the car was "wanted in a shooting uptown."
Amaral and Stokes worked their next shift together on the next evening, from May 17th into the morning of May 18th. Around midnight, they saw the white Dodge minivan parked on Rivington Street near Baruch Drive. They looked inside the minivan, but seeing nothing that would allow them to impound the car, they decided to continue their shift. They agreed that "if [they] saw the vehicle take off, [they would] pull it over." Shortly before 6:00 a.m., Amaral and Stokes were parked around the corner from where they had previously seen the minivan. They saw the car approach the intersection and turn right. Amaral turned his vehicle's lights on and pulled the minivan over.
Following an encounter in which the defendant refused to exit the vehicle and then reached for and grabbed a gun from the center console of the car, the defendant was arrested. As relevant here, he was charged with two counts of criminal possession of a weapon in the second degree and one count of reckless endangerment in connection with the April 28th road rage incident in Washington Heights, and two counts of criminal possession of a weapon in the second degree stemming from the traffic stop on May 18th on the Lower East Side.
Before trial, the defendant moved to suppress evidence that resulted from the stop, arguing that the officers lacked reasonable suspicion to conduct a traffic stop. The court denied the suppression motion, holding that "there were articulable and credible reasons for the officers to stop the white Dodge Caravan on May 18, 2019." The court noted that Officer Amaral had reviewed information indicating that the car was suspected of being involved in a shooting, and that a Hispanic male associated with the car might be armed and dangerous; that Amaral and Stokes observed the car had the same license plate and was the same make and model as the car reportedly involved in the shooting; and that Amaral and Stokes spoke with a traffic enforcement officer the previous day and learned that this same car had been used to evade a traffic citation and almost hit the traffic agent. On these facts, the court concluded that the officers "had at least reasonable suspicion to believe that the driver of the white Dodge Caravan had committed two separate criminal acts."
A jury subsequently convicted the defendant of all four counts of criminal possession of a weapon in the second degree and one count of reckless endangerment in the first degree.
The Appellate Division affirmed. The Court concluded that "before stopping the van, the BOLO alert notified Officers Amaral and Stokes of the criminal activity involving the van on April 28th; the officers were also aware of the May 17th incident because they both responded to the traffic enforcement agent's call for backup"; and that "the officers' knowledge of either incident alone furnished reasonable suspicion of criminal activity at hand" (233 AD3d 55, 59 [1st Dept 2024]). The Court explained that officers may "draw logical inferences" from the "specific and articulable facts" that form the basis for their reasonable suspicion, and here the inference that the same driver was driving the car during the prior criminal incidents was logical (id at 59-60). One Justice dissented, concluding that the information known at the time of the stop was insufficient to establish reasonable suspicion absent confirmation that the car's owner or driver matched the description of the driver involved in the April 28th incident (see id. at 70 [Rodriguez, J., dissenting]).
The dissenting Justice granted the defendant leave to appeal to this Court.II.
A vehicle stop is lawful if it is "based on a reasonable suspicion that the driver or occupants of the vehicle have committed, are committing, or are about to commit a crime" (People v Balkman, 35 NY3d 556, 559 [2020]). Whether officers have reasonable suspicion depends on "the totality of the circumstances" (People v Rodriguez, 41 NY3d 1, 7 [2023]), and an officer must be able to "point to specific and articulable facts which, along with any [*2]logical deductions, reasonably prompted the [vehicle stop]" (People v Brannon, 16 NY3d 596, 602 [2011], quoting People v Cantor, 36 NY2d 106, 113 [1975]). Information gleaned from a license plate search "may provide police with reasonable suspicion to stop a vehicle" (Balkman, 35 NY3d at 559, citing People v Bushey, 29 NY3d 158, 160 [2017]), provided that the People "present evidence of the content of the information" (id.). Ultimately, the Appellate Division's determination that a vehicle stop was supported by reasonable suspicion presents a mixed question of law and fact and is therefore beyond this Court's review if supported by evidence in the record (id. at 559).
Although police must have individualized suspicion that the driver or occupant of a vehicle has committed a crime to conduct a traffic stop, information about a car's involvement in prior criminal activity may support a finding of reasonable suspicion (see People v Shabazz, 99 NY2d 634 [2003]). Such prior activity contributes to a determination of reasonable suspicion when it occurs with sufficient temporal and geographic proximity to the stop to infer that the person who was driving the car during the prior crime is also driving at the time of the stop (see id. at 635-636 [officers had reasonable suspicion to stop a car matching the description and license plate of a car "recently" involved in a shooting]; People v Glaze, 255 AD2d 932, 932-933 [4th Dept 1998] [officers had reasonable suspicion to stop a truck that fit the description of a truck used in a crime one mile from the crime scene, 40 minutes after the crime occurred]; People v Daily, 194 AD3d 1068, 1069 [2d Dept 2021] ["officers had reasonable suspicion to stop the vehicle based upon the fact that the color, type, and specific features of the vehicle matched those of a vehicle which had been involved in a previous burglary in the same area less than two weeks before the stop"]; People v Ballard, 16 AD3d 697, 697 [2d Dept 2005] ["Based upon the specific description of the vehicle allegedly involved in a shooting one to two weeks earlier, which was confirmed before the investigatory traffic stop, the hearing court properly found that there was reasonable suspicion"]).
Here, we conclude that there is record support for the Appellate Division's finding that the stop of the defendant's vehicle was supported by reasonable suspicion. The officers who stopped the defendant on May 18th had information from a license plate search indicating that a white Dodge Caravan with a license plate number matching the defendant's vehicle was involved in a road rage shooting in Washington Heights on April 28th. Although that information was nearly three weeks old, the officers also knew from their conversation with the traffic agent that less than 24 hours before the stop and in the same neighborhood, someone driving the same car had evaded a parking ticket and nearly hit the traffic agent as they drove away. Because the driver during the traffic infraction sped away, almost hitting the traffic agent, the officers could have reasonably inferred that the driver during the parking violation was also the driver during the shooting and fled to avoid repercussions from the shooting. Thus, in addition to inferring that there was a connection between the vehicle and the two incidents, they also reasonably inferred that the same person was driving that vehicle during both incidents. Moreover, the officers knew from the vehicle's registration that it was privately owned, which significantly narrowed the universe of potential drivers [FN1]. Considering the totality of these circumstances, we find no basis to disturb the Appellate Division's determination that the stop was supported by reasonable suspicion.
Accordingly, the order of the Appellate Division should be affirmed.
Order affirmed. Opinion by Judge Halligan. Chief Judge Wilson and Judges Rivera, Garcia, Singas, Cannataro and Troutman concur.
Decided February 19, 2026

Footnotes

Footnote 1: The defendant contends that the officers could not draw this inference because the car was left parked overnight in between the traffic enforcement incident on May 17th and the stop on May 18th. Although the temporal proximity of prior criminal activity involving the same vehicle may bear on whether there is reasonable suspicion, we decline to adopt a bright line rule that precludes an inference when a car is left parked overnight. Rather, as we have repeatedly said, reasonable suspicion should be determined based on the totality of the circumstances (see Rodriguez, 41 NY3d at 7).